[No. B145562. Second Dist., Div. Two. Dec. 6, 2001.]

DANIEL LAPLANTE, a Minor, etc., Plaintiff and Appellant, v. WELLCRAFT MARINE CORP. et al., Defendants and Respondents.

## COUNSEL

Agnew & Brusavich, Bruce M. Brusavich, Donn W. Christensen; Perona, Langer, Beck & Lallande, Lawrence Lallande; Esner & Chang and Stuart B. Esner for Plaintiff and Appellant.

Bowman and Brooke, Robert K. Miller, Sonja Starins and Anthony S. Thomas for Defendants and Respondents Wellcraft Marine Corp. and Genmar Holdings, Inc.

McKasson & Klein, Neil B. Klein and Mark D. Holmes for Defendant and Respondent Galaxie Miller's Landing, Inc.

## OPINION

**DOI TODD, J.**—Daniel LaPlante appeals from a summary judgment rendered against him and in favor of defendants Wellcraft Marine Corp., Genmar Holdings, Inc., and Galaxie Miller's Landing, Inc., on LaPlante's complaint for negligence, strict liability and breach of warranty. His claims arose from serious personal injuries he suffered in a boating accident. The trial court granted summary judgment on the ground that LaPlante's claims were preempted by the Federal Boat Safety Act of 1971 (FBSA). (46 U.S.C. § 4301 et seq.) LaPlante contends that (1) the trial court erred in ruling that the FBSA preempted the entire field of boat safety, (2) even if the FBSA preempted certain aspects of the field of boat safety, it did not preclude his common law claims, and (3) even if the FBSA preempted the entire field of boat safety and common law claims, it did not preempt claims for negligent employment of safety devices as contrasted with a failure to employ them.

We conclude that LaPlante's claims were not preempted and reverse the summary judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

In 1998, LaPlante, then age 11, was a passenger sitting in the bow of a recreational boat designed and manufactured by Wellcraft and Genmar and distributed by Galaxie when he was thrown from the boat and then struck by it, sustaining serious injuries. LaPlante filed suit claiming inadequate handholds in the tow area, asserting causes of action for negligence, strict products liability and breach of warranty against the defendants.

The complaint alleged that defendants negligently "manufactured, designed, constructed, equipped, tested, installed, moved, connected, wired,

serviced, repaired, assembled, supplied component parts, maintained, handled, and otherwise controlled said boat that said boat was defective and unsafe when used and operated in the manner for which it was intended. Said defects included, but are not limited to, the failure to provide and maintain necessary safety devices thereon and the failure to warn and advise prospective purchasers, users, operators, and passengers of the absence of, and of the necessity for, such safety devices, and of the dangers resulting from such absence of safety devices."

Galaxie moved for summary judgment on the sole ground that LaPlante's claims were barred by the FBSA under the doctrines of field or conflict preemption. Wellcraft and Genmar joined in Galaxie's motion.

LaPlante argued in opposition that the FBSA did not preempt the field and that his claims did not conflict with the FBSA because the Coast Guard never regulated the area of handholds. He also contended that his claims included that the grab rails and handrails that were installed in the bow area were inadequate and deficient. The court rejected this claim as beyond the allegations of the complaint.

Relying on *Carstensen v. Brunswick Corp.* (8th Cir. 1995) 49 F.3d 430, 431, the trial court ruled that LaPlante's common law tort claims were barred by the doctrine of field preemption. In granting the motion for summary judgment, the court stated: "Congress and the Coast Guard have not adopted regulations requiring guard rails or the like on open bow boats. Because the federal government has preempted state law, there can be no common law cause of action for the failure to install grab rails."

## APPEALABILITY

Defendants' motion for summary judgment was granted on September 1, 2000, and judgments were entered in favor of Wellcraft, Genmar and Galaxie and against LaPlante on October 17, 2000. On October 23, 2000, LaPlante filed and served a notice of appeal from the order granting the motions for summary judgment, which is not an appealable order. (*City of Oakland v. Superior Court* (1996) 45 Cal.App.4th 740, 750 [53 Cal.Rptr.2d 120].) We construe the notice of appeal to have been from the subsequently entered judgments. (Code Civ. Proc., § 904.1, subd. (a)(1); *Starzynski v. Capital Public Radio, Inc.* (2001) 88 Cal.App.4th 33, 36, fn. 1 [105 Cal.Rptr.2d 525].).

## STANDARD OF REVIEW

The trial court's ruling on a motion for summary judgment is subject to de novo review. (*Castillo v. City of Los Angeles* (2001) 92 Cal.App.4th

477, 480 [111 Cal.Rptr.2d 870].) A "motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) To be entitled to judgment as a matter of law, the moving party must show by admissible evidence that the "action has no merit or that there is no defense." (Code Civ. Proc., § 437c, subd. (a).) A defendant moving for summary judgment meets this burden by showing that one or more elements of the cause of action cannot be established or that there is a complete defense to the action. (Code Civ. Proc., § 437c, subd. (o)(2).)

## DISCUSSION

### A. The Preemption Doctrine

"Article VI of the Constitution provides that the laws of the United States 'shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.' Art. VI, cl. 2. ■ Thus, since [the] decision in *McCulloch* v. *Maryland*, [17 U.S. (4 Wheat.)] 316, 427 (1819) [4 L.Ed. 579], it has been settled that state law that conflicts with federal law is 'without effect.' . . . Consideration of issues arising under the Supremacy Clause 'start[s] with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress.' . . . Accordingly, ' "the purpose of Congress is the ultimate touchstone" ' of pre-emption analysis. . . . [¶] Congress' intent may be 'explicitly stated in the statute's language or implicitly contained in its structure and purpose.' . . . In the absence of an express congressional command, state law is pre-empted if that law actually conflicts with federal law, . . . , or if federal law so thoroughly occupies a legislative field ' "as to make reasonable the inference that Congress left no room for the States to supplement it." ' " (*Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504, 516 [112 S.Ct. 2608, 2617, 120 L.Ed.2d 407], citations omitted.)

■ There is "express preemption" if Congress specifically states the extent to which it intends federal law to preempt state law. "Field preemption" results when Congress has pervasively regulated an area, or federal law implicates a dominant federal interest, reflecting an intent that federal law occupy the entire field. "Conflict preemption" results when state and federal law actually conflict, or state law is an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. (*Lewis v. Brunswick Corp.* (11th Cir. 1997) 107 F.3d 1494, 1500 (*Lewis*).)

B. *The FBSA*

The FBSA was originally enacted in 1971 to "improve boating safety by requiring manufacturers to provide safer boats and boating equipment to the public through compliance with safety standards to be promulgated by the Secretary of the Department in which the Coast Guard is operating— presently the Secretary of Transportation." (Pub.L. No. 92-75 (Aug. 10, 1971) 85 Stat. 213-214, Sen.Rep. No. 92-248, 1st Sess. (1971), reprinted in 1971 U.S. Code Cong. & Admin. News, p. 1333.)

The original act further declared that congressional policy was to "encourage greater and continuing uniformity of boating laws and regulations as among the several States and the Federal Government . . . ." (FBSA, Pub.L. No. 92-75, § 2 (Aug. 10, 1971) 85 Stat. 213-214.) The FBSA was aimed at regulating only boats for "noncommercial use." (*Id.*, § 3(1)(A).)[1]

The FSBA does not mandate the promulgation of regulations, instead, it provides that the "Secretary *may* prescribe regulations— [¶] (1) establishing minimum safety standards for recreational vessels and associated equipment . . . . [¶] . . . [¶] (2) requiring the installation, carrying, or use of associated equipment (including . . . life- and grab-rails . . .) on recreational vessels and classes of recreational vessels subject to this chapter, and prohibiting the installation, carrying, or use of associated equipment that does not conform with safety standards established under this section . . . ." (46 U.S.C. § 4302(a)(1) & (2), italics added.) The Senate Report commented: "While the language of [46 United States Code section 4302(a)(1) & (2)] is permissive and not mandatory, the Committee expects that initial standards will be promulgated as soon as practicable." (Sen. Rep. No. 92-248, 1st Sess. (1971), reprinted in 1971 U.S. Code Cong. & Admin. News, p. 1338.)

The Secretary of Transportation delegated the rulemaking authority under the FBSA to the United States Coast Guard. (See 49 C.F.R. § 1.46(n)(1) (2000) ["The Commandant of the Coast Guard is delegated authority to: [¶] . . . [¶] . . . Carry out the functions vested in the Secretary by the . . . [¶] . . . Federal Boat Safety Act of 1971"].)

Two provisions of the FSBA at the core of the controversy presented here are the preemption and savings provisions. (46 U.S.C. §§ 4306 & 4311(g), respectively.)

Title 46 of the United States Code section 4306 provides: "Federal preemption. [¶] Unless permitted by the Secretary under section 4305 of this

---

[1]The FBSA was amended in 1983 and 1984 and sections 2 and 3 of the original act were repealed.

title, a State or political subdivision of a State may not establish, continue in effect, or enforce a law or regulation establishing a recreational vessel or associated equipment performance or other safety standard or imposing a requirement for associated equipment . . . that is not identical to a regulation prescribed under section 4302 of this title." The Senate Report with regard to this section stated that: "This conforms to the long history of preemption in maritime safety matters and is founded on the need for uniformity applicable to vessels moving in interstate commerce." (Sen. Rep. No. 92-248, 1st Sess. (1971), reprinted in 1971 U. S. Code Cong. & Admin. News, p. 1341.)

Title 46 of the United States Code section 4311(g) provides: "Compliance with this chapter or standards, regulations, or orders prescribed under this chapter does not relieve a person from liability at common law or under State law." The Senate Report explained: "This section is a Committee amendment . . . . The purpose of the section is to assure that in a product liability suit mere compliance by a manufacturer with the minimum standards promulgated under the Act will not be a complete defense to liability. Of course, depending on the rules of evidence of the particular judicial forum, such compliance may or may not be admissible for its evidentiary value." (Sen. Rep. No. 92-248, 1st Sess. (1971), reprinted in 1971 U.S. Code Cong. & Admin. News, p. 1352.)

C. *There Is No Presumption of Nonpreemption Applicable Here.*

■ Appellant contends that his tort claims are within the traditional exercise of the state's police power and are therefore presumed not to be preempted by the FBSA. There is a presumption that matters within the traditional police powers of the state are not superseded by a federal act unless congressional intent to preempt is clear. (*Jones v. Rath Packing Co.* (1977) 430 U.S. 519, 525 [97 S.Ct. 1305, 1309, 51 L.Ed.2d 604]; *Rice v. Santa Fe Elevator Corp.* (1947) 331 U.S. 218, 230 [67 S.Ct. 1146, 1152, 91 L.Ed. 1447].) But this presumption is not triggered when the state regulates in an area where there has been a history of significant federal presence. (*United States v. Locke* (2000) 529 U.S. 89, 108 [120 S.Ct. 1135, 1147-1148, 146 L.Ed.2d 69] (*Locke*).

Although appellant's claims relate to health and safety matters which have traditionally been regulated through the state's police powers, they also implicate maritime activity, an area traditionally within the purview of federal regulation. (*Kelly v. Washington* (1937) 302 U.S. 1, 4 [58 S.Ct. 87, 89, 82 L.Ed. 3] ["The federal acts and regulations with respect to vessels on the navigable waters of the United States are elaborate."].) We therefore find no presumption of nonpreemption.

D. *Appellant's Common Law Claims Are Not Expressly Preempted by the FBSA.*

Nothing in the FBSA explicitly provides that it supersedes appellant's common law tort claims. The preemption provision provides that "a State or political subdivision of a State may not establish, continue in effect, or enforce a law or regulation establishing a recreational vessel or associated equipment performance or other safety standard or imposing a requirement for associated equipment . . . that is not identical to a regulation prescribed under section 4302 of this title." (46 U.S.C. § 4306.) While the statute does not specifically refer to common law claims but only to "law[s] or regulation[s]," an "overwhelming majority" of courts have read that language to include state tort actions. (See *Lewis, supra,* 107 F.3d at p. 1501 and cases cited therein.) However, the preemption provision only expressly precludes a state from enforcing a law or regulation that is not identical to a regulation *prescribed* by the Coast Guard. It does not prohibit the establishment or enforcement by state laws or regulations for which no Coast Guard regulations have been promulgated.

Furthermore, the preemption provision must be read in conjunction with the FBSA savings clause, which provides: "Compliance with this chapter or standards, regulations, or orders prescribed under this chapter does not relieve a person from liability at common law or under State law." (46 U.S.C. § 4311(g).) When the preemption provision is considered with the savings clause, it is clear that Congress did not expressly preempt the regulation of recreational boating. As stated in *Lewis*: "The preemption clause easily could be read to cover common law claims, but because the savings clause indicates that at least some common law claims survive express preemption, we cannot give the preemption clause that broad reading. . . . We hold that those claims are not expressly preempted. [¶] . . . The express terms of the FBSA simply fail to answer the question of whether Congress intended to preempt common law claims." (*Lewis, supra,* 107 F.3d at pp. 1501-1502.)

E. *The FBSA Does Not Preempt the Entire Field of Recreational Boat Safety.*

The trial court concluded that appellant's claims were preempted by field preemption as a matter of law. Respondents assert this conclusion is supported by congressional intent to occupy the field and preempt any state law in the area of recreational boat safety as evidenced by (1) the enactment by the FBSA of a coordinated national boating safety program involving both the federal government and the states, (2) the grant to the Secretary of

Transportation the exclusive authority to prescribe regulations establishing safety standards for recreational boats, (3) the extensive history of federal regulation of the maritime industry, and (4) the FBSA preemption provision. But these arguments do not sufficiently consider the FBSA savings clause and the concept of field preemption. Furthermore, the cases on which respondents rely do not support field preemption here.

Respondents argue that *Locke* establishes federal field preemption through the FBSA. We disagree. *Locke* considered the question of whether Washington State regulations governing oil tanker design and operations, adopted in the wake of the tragic Exxon Valdez oil spill of 1989, were preempted by the comprehensive federal regulatory scheme in place governing oil tankers. (*Locke, supra*, 529 U.S. at p. 94 [120 S.Ct. at p. 1140].) The court noted that the state had "enacted legislation in an area where the federal interest has been manifest since the beginning of our Republic and is now well established. The authority of Congress to regulate interstate navigation, without embarrassment from intervention of the separate States and resulting difficulties with foreign nations, was cited in the Federalist Papers as one of the reasons for adopting the Constitution." (*Id.* at p. 99 [120 S.Ct. at p. 1143].) Against the background of federal licensing to promote trade and enhance crew and passenger safety, and federal laws governing certification of vessels and standards of operation, "Congress has enacted a series of statutes pertaining to maritime tanker transports and . . . ratified international agreements on the subject." (*Id.* at p. 100 [120 S.Ct. at p. 1143].)

The regulatory scheme in *Locke* included the Tank Vessel Act of 1936, the Ports and Waterways Safety Act of 1972 (PWSA), and the Oil Pollution Act of 1990, as well as "a significant and intricate complex of international treaties and maritime agreements bearing upon the licensing and operation of vessels," all of which depend upon the principle of international reciprocity. (*Locke, supra*, 529 U.S. at p. 102 [120 S.Ct. at p. 1145].)

The most significant difference between *Locke* and the case before us is that the FBSA involves the regulation of recreational vessels, which have far less connection to national and international commerce than commercial oil tankers. Recreational boating frequently occurs on local lakes and rivers exclusively within the borders of a state. We are not aware of any international treaties or maritime agreements that implicate recreational vessels. And while the federal government clearly has constitutional authority to regulate this area, its interest in regulating recreational boating is significantly different from that of regulating commercial oil tankers that affect international trade.

Furthermore, the Supreme Court in *Locke* recognized that even in the field of commercial vessels, under title I of the PWSA, the state remained free to

regulate based on the idiosyncrasies of its local conditions, such as water depth and narrowness of the port or waterway, as long as the state regulation was "so directed and if the Coast Guard has not adopted regulations on the subject or determined that regulation is unnecessary or inappropriate." (*Locke, supra,* 529 U.S. at p. 109 [120 S.Ct. at p. 1148].) On the other hand, under title II of the PSWA, Congress mandated uniform federal rules on the subjects of " 'design, construction, alteration, repair, maintenance, operation, equipping, personnel qualification, and manning' " of tankers, clearly manifesting an intent to preempt the field in those areas. (*Locke, supra,* at p. 111 [120 S.Ct. at p. 1149].) The court recognized the difficulty in determining whether a particular preemption question was controlled by conflict preemption principles, as applicable to title I, or the field preemption, as applicable to title II, but "declined to resolve every question by the greater pre-emptive force of Title II." (*Id.* at p. 111 [120 S.Ct. at p. 1149].) The court then went on to review whether specific Washington regulations were justified by conditions unique to a particular port or waterway. It found that state regulations requiring special training, English language proficiency for the crew, navigation watch in local waters, and certain casualty reporting were not, and that those subjects had been preempted by specific federal regulations.

*Locke* does not lead us to conclude that appellant's claims here are preempted. We find factors that respondents overlook to be determinative on the issue of field preemption.

First, boat safety has traditionally been within the purview of state regulation. In *Lewis,* the court recognized that the FBSA regulated an area "historically . . . regulated by the states through their police powers." (*Lewis, supra,* 107 F.3d at p. 1501.) While we have no doubt that Congress could nonetheless preempt state regulation of this area, if there were such an intent it would be more clearly stated.

Second, the language of the FBSA preemption clause is limited. It provides that "a State . . . may not establish . . . a law or regulation establishing a recreational vessel or associated equipment performance or other safety standard or imposing a requirement for associated equipment . . . that is not identical to a regulation prescribed under section 4302 . . . ." (46 U.S.C. § 4306.) This limitation only precludes a state from acting when the Coast Guard has promulgated a regulation. Any other interpretation would render the words "identical to a regulation prescribed under section 4302" nugatory. If Congress had intended field preemption, it could have instead provided that a state may not establish a boat safety standard.

Third, the FBSA savings clause makes clear that the act did not intend to preclude all state regulation. The precise scope of that clause and its

relationship with the preemption clause is not completely clear and has been the subject of conflicting opinions. But it is clear that some measure of state regulation is permissible. As stated in *Lewis,* "[f]rom the savings clause, we know that Congress understood at least some product liability claims to be consistent with the FBSA regulatory scheme." (*Lewis, supra,* 107 F.3d at p. 1504.)

Fourth, FBSA does not mandate the promulgation of regulations but is merely permissive, "The secretary *may* prescribe regulations— . . ." (46 U.S.C. § 4302(a), italics added.) It would be anomalous for Congress to manifest an intent to preempt the field without requiring the Coast Guard to promulgate regulations.

Fifth, the Coast Guard has not promulgated a comprehensive scheme of federal regulation.

Based on the foregoing, we conclude that Congress did not intend that the FBSA preempt the entire filed of recreational boat safety.

F. *Appellant's Claims Are Not Subject to Conflict Preemption.*

Our conclusion that appellant's claims are not expressly preempted or subject to field preemption does not foreclose the potential for conflict preemption, which results " 'when compliance with both state and federal law is impossible, or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress." ' " (*Locke, supra,* 529 U.S. at p. 109 [120 S.Ct. at p. 1148].)

"In this context, Coast Guard regulations are to be given pre-emptive effect over conflicting state laws." (*Locke, supra,* 529 U.S. at pp. 109-110 [120 S.Ct. at p. 1148].) But here, the Coast Guard has not adopted any regulations dealing with handrails or handgrips pursuant to its authority under the FBSA. There is no federal regulation that would conflict with a state common law claim of negligent failure to install such handhold devices.

Respondent argues that the absence of a regulation evidences congressional intent not to regulate. " '[A] federal decision to forego regulation in a given area may imply an authoritative federal determination that the area is best left *un*regulated, and in that event would have as much preemptive force as a decision *to* regulate.' [Citation.] Though a decision not to regulate does not always have preemptive effect, [citation], it does 'where [the] failure of . . . federal officials affirmatively to exercise their full authority takes on

the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute.' [Citation.]" (*Lewis, supra,* 107 F.3d at p. 1502.)

Respondents point to the "propeller guard" cases in which the courts have uniformly concluded that the failure of the Coast Guard to adopt a regulation regarding propeller guards reflected an intention that the area not be regulated. (See, e.g., *Carstensen v. Brunswick Corp., supra,* 49 F.3d at p. 431; *Moss v. Outboard Marine Corp.* (E.D.Cal. 1996) 915 F.Supp. 183, 186 ["The determination by the Coast Guard not to regulate the installation of propeller guards has the same preemptive force as a decision to regulate."]; *Lady v. Neal Glaser Marine, Inc.* (2000) 228 F.3d 598, 615 ["We do not hold that simply because the Coast Guard has not acted on a safety matter that state action is precluded. Rather, where the Coast Guard has been presented with an issue, studied it, and affirmatively decided as a substantive matter that it was not appropriate to impose a requirement, that decision takes on the character of a regulation and the FBSA's objective of national uniformity mandates that state law not provide a result different than the Coast Guard's."]; *Lewis, supra,* 107 F.3d at pp. 1502-1503.)

But the absence of Coast Guard regulation of handhold devices does not of itself reflect an intention that that handhold devices remain unregulated. In each of the propeller guard cases, the court's determination that state common law claims for negligent failure to install propeller guards had been preempted was based on the detailed process through which the Coast Guard decided not to require propeller guards. The advisory council to the Coast Guard had been directed to examine the feasibility and potential safety advantages and disadvantages of propeller guards. A propeller guard subcommittee was formed to investigate the matter, and hearings were held. A determination was made that propeller guards would adversely affect boat operation and would not increase overall safety. The subcommittee presented the report to the advisory council, which adopted its recommendations. (*Lewis, supra,* 107 F.3d at pp. 1498-1499.) There was a thorough record that a conscious and intentional determination was made by the Coast Guard that boats should not be required to have propeller guards.

There is no evidence here that any comparable decisionmaking process was undertaken by the Coast Guard with respect to handhold devices. There is no evidence of any investigation or hearings on the subject or any findings that such devices, after balancing cost, advantages and disadvantages, should not be used on recreational boats.

In support of the motion, Galaxie proffered the declaration of Lysle Gray who was employed by the Coast Guard as chief of the Product Safety

Assurance Branch in the Office of Boating Safety from 1973 to 1987. In his declaration Gray stated that the Coast Guard considered accident statistics and other research, after which it "chose to not regulate open bow seating areas. Likewise, the United States Coast Guard chose to not issue any regulations with respect to handholds, handrails and grabrails."

Appellant objected to Gray's declaration on the grounds that it was mere opinion, reflected that Gray left the Coast Guard prior to the relevant time period, was contradicted by the statement in *Becker v. U.S. Marine Company* (1997) 88 Wash.App. 103 [943 P.2d 700], was hearsay, and was not material.

We agree with the trial court that that declaration of Lysle Gray was inadmissible. It was largely hearsay and conclusory, and was incompetent to establish that the Coast Guard made a conscious decision not to require handhold devices.

In the absence of clear statutory intent, or evidence that the Coast Guard intended there be no regulation of handhold devices, we conclude that appellant's claims were not subject to conflict preemption.

G. *Appellant's Claim for Negligent Installation of Handhold Devices, as Contrasted with Claims for Failure to Install Them, Are Not Preempted by the FBSA.*

■ Appellant contends that even if his claims for failure to install handhold devices were preempted, his claim that defective handhold devices were installed was not. The parties agree the cases uniformly hold that the FBSA savings clause permits common law claims for defective products that have been installed.[2] "Permitting product liability claims against manufacturers for negligent or defective design of products required by the Coast Guard, or for products provided voluntarily by manufacturers, simply requires manufacturers to comply with FBSA regulations, and to do any additional manufacturing, in a non-negligent and non-defective manner. Permitting such claims is consistent with the FBSA scheme . . . ." (*Lewis, supra,* 107 F.3d at p. 1505.)

---

[2](*Moss v. Outboard Marine Corp., supra,* 915 F.Supp. at p. 187 ["The stated purpose of FBSA's savings clause is 'to assure that in a product liability suit mere compliance by a manufacturer with the minimum standards promulgated under the Act will not be a complete defense to liability.' [Citation.] This provision has been interpreted to prevent a manufacturer from relying on its compliance with the minimum safety standards set forth in the FBSA as a defense to state common law claims that it *actually installed* defectively designed products. [Citations.]"]; *Lewis, supra,* 107 F.3d at p. 1504 ["[S]everal courts have held that the only claims which do not present a conflict with the FBSA regulatory scheme are product liability claims based on the defective design or installation of products that are already installed, as opposed to claims based on the failure to install a certain safety device"]; *Carstensen v. Brunswick Corp., supra,* 49 F.3d at p. 432.)

Respondents argue that appellant cannot rely on this theory of liability because appellant has only pled claims based on a failure to install, not on defectively installed products, and summary judgment must be premised on the parties' pleadings. Respondents are correct that summary judgment cannot be granted or denied on issues not raised by the pleadings. (*FPI Development, Inc. v. Nakashima* (1991) 231 Cal.App.3d 367, 381-382 [282 Cal.Rptr. 508].) For example, where a complaint alleged negligence in failing to warn of a manufacturing defect, the plaintiff could not defeat a summary judgment motion by showing that the defendant was negligent in failing to discover the defect. (*Lewinter v. Genmar Industries, Inc.* (1994) 26 Cal.App.4th 1214, 1223 [32 Cal.Rptr.2d 305].)

But the allegations of the complaint are broad enough to include a claim for negligently installed products. Plaintiff alleged that defendants negligently "manufactured, designed, constructed, equipped, tested, installed, moved, connected, wired, serviced, repaired, assembled, supplied component parts, maintained, handled, and otherwise controlled said boat that said boat was defective and unsafe when used and operated in the manner for which it was intended. Said defects included, but are not limited to, the failure to provide and maintain necessary safety devices thereon and the failure to warn and advise prospective purchasers, users, operators, and passengers of the absence of, and of the necessity for, such safety devices, and of the dangers resulting from such absence of safety devices." These allegations are sufficient to support the claim that defendants negligently "supplied component parts" or "serviced" or "designed" the handhold devices that were on the boat.

### DISPOSITION

The summary judgment is reversed. Appellant is awarded his costs on appeal.

Boren, P. J., and Nott, J., concurred.

The petitions of respondents Wellcraft Marine Corp. and Galaxie Miller's Landing, Inc., for review by the Supreme Court were denied March 13, 2002. Kennard, J., was of the opinion that the petitions should be granted.