[No. B171050. Second Dist., Div. One. Aug. 31, 2004.]

SOUTHERN CALIFORNIA EDISON COMPANY, Petitioner, v.
PUBLIC UTILITIES COMMISSION, Respondent;
CENTER FOR ENERGY EFFICIENCY AND RENEWABLE
TECHNOLOGIES, Real Party in Interest.

**COUNSEL**

Stephen E. Pickett, Michael D. Mackness and Erin K. Moore for Petitioner.

Randolph L. Wu, Mary F. McKenzie and Karen Paull for Respondent.

Sara Steck Myers; Ellison, Schneider & Harris, Christopher T. Ellison, Jeffery D. Harris and Lynn M. Haug for Real Party in Interest.

**OPINION**

**MALLANO, J.**—To accommodate the connection of newly created sources of electrical energy to a transmission facility that is part of the national grid, it is often necessary to upgrade the grid at the point of interconnection. Federal law, as set forth in a recent order of the Federal Energy Regulatory Commission (FERC), states that the generator of the energy is initially

responsible for the costs of the upgrade but further provides that the owner of the transmission facility, typically a public utility such as petitioner Southern California Edison (SCE), may elect to pay those costs. (In either case, the costs are later reimbursed through energy sales.) California Public Utilities Code section 399.25, as interpreted by respondent California Public Utilities Commission (PUC), permits a requirement that the public utility pay the up-front costs. The issue in this case is whether PUC's interpretation has been preempted by federal law. We conclude that it has. Accordingly, on a petition for a writ of review filed by SCE, we annul certain PUC decisions to the extent they purport to interpret Public Utilities Code section 399.25 to permit a requirement that transmission owners pay the up-front costs of network upgrades.

## BACKGROUND

The California Energy Security and Reliability Act of 2000 (Assem. Bill No. 970 (1999–2000 Reg. Sess.)), contains a legislative declaration that "[i]n recent years there has been significant growth in the demand for electricity in the state due to factors such as growth in population and economic activities that rely on electrical generation," and that "[a]s a result, California faces potentially serious electricity shortages over the next two years, which necessitates immediate action by the state." (Stats. 2000, ch. 329, § 2(a), (c).) On November 2, 2000, PUC filed Investigation No. 00-11-001, instituting investigation into implementation of Assembly Bill No. 970.

In 2002, California Senate Bills Nos. 1038 and 1078 (2001–2002 Reg. Sess.), both addressing the state's need for generation of renewable electrical energy (such as wind, solar, and geothermal energy), were signed into law. (Stats. 2002, chs. 515, 516.) This legislation, which included Public Utilities Code section 399.25, called upon the state to increase its electrical generation from renewable sources by at least 1 percent a year until those sources comprise 20 percent of the energy procured by public utilities such as SCE. In early 2003, as part of Investigation No. 00-11-001, PUC requested "Comments on Procedural Coordination of Renewables Procurement, Transmission Planning and Statutory Interpretation of Pub. Util. Code, § 399.25."[1] ((Feb. 25, 2003)

---

[1] Public Utilities Code section 399.25 provides: "(a) Notwithstanding any other provision in Sections 1001 to 1013, inclusive, an application of an electrical corporation for a certificate authorizing the construction of new transmission facilities shall be deemed to be necessary to the provision of electric service for purposes of any determination made under Section 1003 if the commission finds that the new facility is necessary to facilitate achievement of the renewable power goals established in Article 16 (commencing with Section 399.11).

"(b) With respect to a transmission facility described in subdivision (a), the commission shall take all feasible actions to ensure that the transmission rates established by the Federal Energy Regulatory Commission are fully reflected in any retail rates established by the commission. These actions shall include, but are not limited to:

<http://www.cpuc.ca.gov/WORD_PDF/RULINGS/23849.doc> [as of Aug. 17, 2004].)

On July 10, 2003, PUC issued Decision No. 03-07-033, captioned *Interim Opinion on Procedures to Implement Public Utilities Code Section 399.25* (hereafter *Interim Opinion*) [2000 Cal.PUCLEXIS 1128]. Among the many topics covered, the *Interim Opinion* discussed the financing of upgrades to the grid network. The *Interim Opinion* provides in part:

"By way of definition, we refer to transmission facilities needed to bring power from the plant to the first point of interconnection with the existing transmission grid as 'gen-ties.' We refer to facilities needed to upgrade the existing transmission grid to ensure reliable electric service and full delivery of a generator's output with the added generation as 'network' or 'system' upgrades. Under current FERC policy, new generators absorb gen-tie costs as part of the cost of producing power. With respect to network upgrade costs, current FERC policy requires a new generator to fund network upgrades for which the new generator is the 'but for' causation. However, the transmission owner (e.g., the [public utilities]) must credit back those costs, with interest, in monthly payments amortized over a number of years beginning when the new generation is available to the grid. Thus, the renewable developer knows that it currently must finance the needed transmission network upgrades, but will receive that money back with interest once it comes on-line.

"The language of § 399.25 does not modify the developer's cost responsibility for either gen-ties or network upgrades. The former continues to be funded by the new generator and the latter by ratepayers, under current FERC policies. The difference is that § 399.25 (b) provides the *possibility* of 'rolled-in ratemaking' for network upgrade costs, which we define to mean that the developer would not have to fund network upgrades upfront and await recovery of those costs over time. Instead, ratepayers would fund those costs—either in transmission rates (authorized by FERC) or in retail rates authorized by this Commission. More specifically, the utilities would finance

"(1) Making findings, where supported by an evidentiary record, that those transmission facilities provide benefit to the transmission network and are necessary to facilitate the achievement of the renewables portfolio standard established in Article 16 (commencing with Section 399.11).

"(2) Directing the utility to which the generator will be interconnected, where the direction is not preempted by federal law, to seek the recovery through general transmission rates of the costs associated with the transmission facilities.

"(3) Asserting the positions described in paragraphs (1) and (2) to the Federal Energy Regulatory Commission in appropriate proceedings.

"(4) Allowing recovery in retail rates of any increase in transmission costs incurred by an electrical corporation resulting from the construction of the transmission facilities that are not approved for recovery in transmission rates by the Federal Energy Regulatory Commission after the commission determines that the costs were prudently incurred in accordance with subdivision (a) of Section 454."

these transmission projects as part of rate base, with the associated costs recovered in rates. Under this scenario, ratepayers assume the financial risk of the generation projects actually coming on line." (*Interim Opn., supra,* pp. 10–11, fns. omitted [2000 Cal.PUCLEXIS 1128, pp. *15–*17].)

The Interim Opinion also addresses the responses of SCE and Pacific Gas & Electric (PG&E) to PUC's previous request for comments. In these comments, SCE and PG&E argued that federal preemption precludes an interpretation of Public Utilities Code section 399.25 that requires the utilities to pay up front for the costs of network upgrades. The Interim Opinion states: "PG&E and SCE are simply incorrect . . . . In this regard, we note that nowhere in their comments do either PG&E or SCE cite to a specific federal law or FERC rule that articulates this FERC policy as a legally binding requirement. Nor could they do so if they tried, because the FERC policy in question, which requires the developers of new generation to front transmission system network upgrade costs and to recover these costs in credits after the new upgrade is available to the grid, is precisely that—a policy; it is neither a law nor a rule. [¶] The various FERC decisions cited in PG&E's comments reflect various instances in which that policy was implemented.[2] However, the implementation by a federal agency such as FERC of a particular policy preference in various individual cases does not amount to the establishment of federal 'law' that supports the application of the doctrine of federal preemption, and the states must be presumed to be able to implement their own alternative policy preferences in such matters unless federal law expressly or impliedly mandates otherwise." (*Interim Opn., supra,* pp. 25–26 [2000 Cal.PUCLEXIS 1128, pp. *38–*39].)

SCE filed an application for rehearing. On October 2, 2003, the application was denied in Cal. P.U.C. Decision No. 03-10-020, captioned "Order Denying Rehearing of Decision 03-07-033" (hereafter Order Denying Rehearing) [2000 Cal.PUCLEXIS 1145]. The Order Denying Rehearing notes that 10 days after issuance of the *Interim Opinion*, FERC issued an order applicable to large power generators, captioned "Standardization of Generator Interconnection Agreements and Procedures" (hereafter Standard Interconnection

---

[2] One of the cited decisions was *American Electric Power Service Corporation* (July 26, 2001) 96 FERC ¶ 61,136 (Order Accepting Unexecuted Generator Interconnection Agreement) [96 F.E.R.C. ¶ 61136, 2001 FERCLEXIS 1831]. There, FERC explained that "the main thrust of [a prior opinion involving the same parties] was to require the [generator] to pay initially for the cost of system upgrades made necessary by the interconnection of its facilities" and that a finding to that effect was "consistent with our *policy*, articulated [in prior cases] that the [generator] should pay for the costs of system upgrades necessary for the interconnection of generation facilities, subject to later crediting." (96 FERC ¶ 61,136 at ¶ 61,567, italics added, fn. omitted [96 F.E.R.C. ¶ 61136, 2001 FERCLEXIS 1831, pp. **8–**9].)

Agreement Order) (104 FERC ¶ 61103 [104 F.E.R.C. ¶ 61103, 2003 FERCLEXIS 1551]). (Order Denying Rehg., *supra*, p. 3 [2000 Cal.PUCLexis, p. *4].) The Order Denying Rehearing continues:

"FERC indisputably has jurisdiction over interconnection agreements ([16] U.S.C. § 824i), and the Standard [Interconnection] Agreement Order that FERC issued on July 24, 2003 is, as [SCE] correctly points out, a Final Rule (effective October 20, 2003) that will require public utility transmission providers to use a Standard Interconnection Agreement. However, as [certain parties] point out, the Standard [Interconnection] Agreement Order does not require that the developer of new generation advance the up-front costs of transmission upgrades. [Citation.] FERC expressly allows the Transmission Provider 'to elect to fund the network upgrades itself, with no advance payment by the Interconnection Customer, and thus no need for subsequent [reimbursement] credits.'[3] (Standard [Interconnection] Agreement Order, ¶ 720.) Section 11.3 of the Standard Large Generator Interconnection Agreement, attached to the Order, provides that 'unless the Transmission Provider or Transmission Owner elects to fund the capital for the Network Upgrades, they shall be solely funded by the Interconnection Customer.'[4] As the Standard [Interconnection] Agreement Order expressly allows the up-front costs to be paid by the Transmission Provider, such an arrangement clearly does not conflict with any of the policy goals discussed in the order. Moreover, this provision does not represent a change in FERC policy; it merely preserves an option that has been available under existing policy. [Citation.]

"The preemption question, therefore, is properly narrowed to whether a federal statute, FERC policy, or FERC rule precludes a state commission from requiring a utility to provide the up-front funding for 'but-for' transmission upgrades, subject to FERC approval of the interconnection agreement. [SCE] has cited no statute, no provision of the Standard [Interconnection]

---

[3] The Standard Interconnection Agreement Order "refer[s] to both the Transmission Provider [(in California, the Independent Service Operator)] and the Transmission Owner [(the utility)] generically as the Transmission Provider." (104 FERC ¶ 61,103, pt. 2.75. [104 F.E.R.C. ¶ 61103, 2003 FERCLEXIS 1551, p. *50].) The "Interconnection Customer" is the owner of the generating facility. (Standard Interconnection Agreement Order, 104 FERC ¶ 61,103, pt. I.3., fn. 3 [104 F.E.R.C. ¶ 61103, 2003 FERCLEXIS 1551, p. *4].)

[4] Section 11.3 provides in full: "Network Upgrades and Distribution Upgrades. Transmission Provider or Transmission Owner shall design, procure, construct, install, and own the Network Upgrades and Distribution Upgrades described in Appendix A [(Flow Chart of the Large Generating Facility Interconnection Process)], Interconnection Facilities, Network Upgrades and Distribution Upgrades. The Interconnection Customer shall be responsible for all costs related to Distribution Upgrades. *Unless the Transmission Provider or Transmission Owner elects to fund the capital for the Network Upgrades, they shall be solely funded by the Interconnection Customer.*" (104 FERC ¶ 61103, appen. C, p. 56, italics added [104 F.E.R.C. ¶ 61103, 2003 FERCLEXIS 1551, p. *10].)

Agreement Order, or any other authority, that expressly precludes a state commission from doing this. The Standard [Interconnection] Agreement Order is silent on this question, and as [a generator of renewable energy that previously submitted comments] correctly points out, the courts are reluctant to infer preemption from silence, especially in the context of a federal statutory scheme that does not entirely supplant state regulation. [Citation.]" (Order Denying Rehg., *supra*, pp. 3–5, fn. omitted [2000 Cal.PUCLEXIS 1145, pp. *5–*8].)

The Order Denying Rehearing continues by noting that "[u]nder the Federal Power Act, the states retain regulatory authority over transmission siting and integrated resource planning, among other things" (Order Denying Rehg., p. 5 [2000 Cal.PUCLEXIS 1145, p. *8]), and that "[w]ith respect to wholesale rates for electric power, FERC has recognized that FERC's jurisdiction over wholesale rates does not preclude state regulators from determining 'whether a purchaser has prudently chosen from among available supply options' " (*ibid.* [2000 Cal.PUCLEXIS 1145, p. *9]). Thus, concludes PUC: "In light of the role state regulators continue to play with respect to transmission upgrades as well as retail rates under the Federal Power Act, we are not persuaded that FERC's silence on this point should be construed as an expression of Congressional intent to preempt state commissions from directing a utility to provide the up-front costs of necessary network upgrades, subject to FERC approval of the interconnection agreement, and to seek recovery of those costs in transmission rates." (Order Denying Rehg., *supra*, p. 6 [2000 Cal.PUCLEXIS 1145, p. *10].)

Following the Order Denying Rehearing, SCE petitioned this court for a writ of review. The petition was opposed by PUC, as well as by real party in interest Center for Energy Efficiency and Renewable Technologies (CEERT). SCE filed a reply, addressing both opposition briefs. We issued a writ of review and set the matter for oral argument.

## DISCUSSION

"A federal statute or regulation may preempt state law in three situations, commonly referred to as (1) express preemption, (2) field preemption, and (3) conflict preemption. ' "First, Congress can define explicitly the extent to which its enactments pre-empt state law." [Citations.] "Second, in the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively." [Citations.] "Finally, state law is pre-empted to the extent that it actually conflicts with federal law." [Citations.]' [Citations.]" (*Olszewski v. Scripps Health* (2003) 30 Cal.4th 798, 814–815 [135 Cal.Rptr.2d 1, 69 P.3d 927].) " 'Federal regulations have no less pre-emptive effect than federal

statutes.' " (*Id.*, quoting *Fidelity Federal Sav. & Loan Assn. v. de la Cuesta* (1982) 458 U.S. 141, 153 [73 L.Ed.2d 664, 102 S.Ct. 3014, 3022].)

SCE's argument is limited to field preemption. As conceded by PUC in the Order Denying Rehearing, "FERC indisputably has jurisdiction over interconnection agreements . . . ." (Order Denying Rehg., *supra*, p. *3 [2000 Cal.PUCLEXIS 1145, p. *5].) Thus, the issue we address is the preemptive effect of this jurisdiction.

As a preliminary matter, we disagree with PUC's assertion that the matter is not ripe for review. This is not a situation, as in *PG&E Corp. v. Public Utilities Com.* (2004) 118 Cal.App.4th 1174 [13 Cal.Rptr.3d 630], where the "admittedly vague" subject matter of a PUC interim opinion had been given "an almost equally ambiguous interpretation." (*Id.* at p. 1217.) The *Interim Opinion* and the Order Denying Rehearing at issue here are unambiguous in asserting PUC control over financing of the up-front costs of interconnection upgrades. And as noted by SCE, negotiations on developing new sources of renewable energy for connection to the grid are being inhibited by the uncertainty over this issue. (See *Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 171 [188 Cal.Rptr. 104, 655 P.2d 306], quoting *Abbott Laboratories v. Gardner* (1967) 387 U.S. 136 [18 L.Ed.2d 681, 87 S.Ct. 1507] [determination of ripeness requires the court " 'to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration' " (italics omitted)].)

Turning to the substantive issue, we note that SCE transmits electricity through the grid, and "any electricity that enters the grid immediately becomes a part of a vast pool of energy that is constantly moving in interstate commerce." (*New York v. FERC* (2002) 535 U.S. 1, 7 [152 L.Ed.2d 47, 122 S.Ct. 1012, 1018].) Federal statutory jurisdiction over transmission of electrical energy emanates from the Federal Power Act (16 U.S.C. § 791a et seq.), which "declare[s] that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest." (16 U.S.C. § 824(a).) "Federal regulation of matters relating to generation . . . and . . . transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States." (16 U.S.C. § 824(a).) The Federal Power Act generally applies to "the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce . . . [and] over all facilities for such transmission or sale of electrical energy." (16 U.S.C. § 824(b)(1).) It gives FERC "jurisdiction over all facilities for such transmission or sale of electric energy . . . ." (16

U.S.C. § 824(b)(1).) The jurisdiction includes the authority to order interconnection to the grid and to specify the terms of the interconnection. (16 U.S.C. §§ 824i, 824k.)

While this matter was pending before PUC, FERC issued the Standard Interconnection Agreement Order. Its background section states that FERC "to date has addressed interconnection issues on a case-by-case basis. Although a number of Transmission Providers have filed interconnection procedures as part of their [open access transmission tariffs], many industry participants remain dissatisfied with existing interconnection policy and procedures. With the increasing number of interconnection related disputes, it has become apparent that the case-by-case approach is an inadequate and inefficient means to address interconnection issues. [¶] . . . Interconnection plays a crucial role in bringing much-needed generation into the market to meet the growing needs of electricity customers. . . . [FERC] concludes that there is a pressing need for a single set of procedures for jurisdictional Transmission Providers and a single, uniformly applicable interconnection agreement for Large Generators."[5] (Standard Interconnection Agreement Order, *supra*, 104 FERC ¶ 61,103, pts. I.A.10.–I.A.11., fns. omitted [104 F.E.R.C. ¶ 61103, 2003 FERCLEXIS 1551, pp. *9–*10].)

Given this vast amount of federal statutory and regulatory authority, SCE relies on the following rule: "In the absence of express pre-emptive language, Congress' intent to pre-empt all state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation. [Citation.] Pre-emption of a whole field also will be inferred where the field is one in which 'the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.' [Citations.]" (*Hillsborough County v. Automated Medical Labs.* (1985) 471 U.S. 707, 713 [85 L.Ed.2d 714, 105 S.Ct. 2371, 2375].)

PUC argues that the federal statutory and regulatory scheme regarding interconnection is not so pervasive as to preempt the field of interconnection agreements and thereby nullify PUC's interpretation of Public Utility Code section 399.25. PUC first relies on the general rule disfavoring implied preemption. As observed in *Consumer Justice Center v. Olympian Labs, Inc.* (2002) 99 Cal.App.4th 1056, 1059 [121 Cal.Rptr.2d 749], because "Congress

---

[5] A separate set of procedures is being established for "Small Generators," defined as generators having a capacity of no larger than 20 megawatts. (Standard Interconnection Agreement Order, *supra*, 104 FERC ¶ 61103, fn. 10 [2003 FERCLEXIS 1551, p. *10].) Although PUC notes in its order denying rehearing and its brief in this court that some generators of renewable energy in California may fall into this category, PUC does not argue that the distinction between large and small generators is pertinent to analysis of the preemption issue in this case.

knows how to write a preemption clause if it wanted to," analysis of a preemption issue should start with a "presumption against preemption." But this presumption is characteristically applied where the field is one that the states have traditionally occupied and regulated. (See, e.g., *Olszewski v. Scripps Health, supra,* 30 Cal.4th at p. 815 [public health and the costs of medical care].) The presumption "is not triggered when the state regulates in an area where there has been a history of significant federal presence. [Citation.]" (*LaPlante v. Wellcraft Marine Corp.* (2001) 94 Cal.App.4th 282, 290 [114 Cal.Rptr.2d 196].) Inasmuch as the field of interconnection agreements has a history of significant federal presence, the presumption against preemption is not applicable here.

PUC further notes that federal policy, as reflected in FERC decisions handed down before the Standard Interconnection Agreement Order was promulgated and in the Standard Interconnection Agreement Order itself, permits utilities that provide transmission facilities to pay the up-front costs of network upgrades. Consequently, PUC urges, federal policy is not in conflict with PUC's interpretation of Public Utilities Code section 399.25, which permits the PUC to require that the transmission-provider utilities to pay these costs. But as stated, SCE has limited its challenge in this case to the existence of field preemption, thereby rendering irrelevant the question of whether an actual conflict exists between state and federal law.

As acknowledged by SCE, the Federal Power Act specifies that certain aspects of the transmission of electrical energy are within state jurisdiction. For example, federal regulation does not "deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line," nor is there federal jurisdiction "over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter." (16 U.S.C. § 824(b)(1).) In addition, certain "qualifying small power production facilit[ies]" (16 U.S.C. § 796(17)(C)) and "qualifying cogeneration facilit[ies]" (16 U.S.C. § 796(18)(B)) are designated to be within the jurisdiction of state regulatory authorities. (See 16 U.S.C. § 824a-3(a), (f).) And as SCE observes was stated with respect to wholesale energy sales in *F.P.C. v. Southern Cal. Edison Co.* (1963) 376 U.S. 205, 215–216 [11 L.Ed.2d 638, 84 S.Ct. 644, 651], "Congress meant to draw a bright line easily ascertained, between state and federal jurisdiction . . . , making FPC[6] jurisdiction plenary and extending it to all wholesale sales in interstate commerce except those which Congress has made explicitly subject to regulation by the States."

[6] FPC is the Federal Power Commission, which was created by the Federal Power Act and is the predecessor to FERC. (See 16 U.S.C. § 792.)

PUC does not rely on any of the areas of state jurisdiction that are specified in the Federal Power Act. Rather, PUC argues there is no field preemption because Congress left room for supplementary state regulation. In so doing, PUC relies primarily on the following language in *New York v. FERC, supra,* 535 U.S. at page 24: "FERC has recognized that the States retain significant control over local matters even when retail transmissions are unbundled. See, *e.g.,* Order No. 888, at 31,782, n. 543 ('Among other things, Congress left to the States authority to regulate generation and transmission siting'); *id.,* at 31,782, n. 544 ('This Final Rule will not affect or encroach upon state authority in such traditional areas as the authority over local service issues, including reliability of local service; administration of integrated resource planning and utility buy-side and demand-side decisions, including [demand-side management]; authority over utility generation and resource portfolios; and authority to impose nonbypassable distribution or retail stranded cost charges')."

But notably absent from PUC's *Interim Opinion,* Order Denying Rehearing, and briefing to this court is an explanation either of the process of "siting" or of the "traditional areas" to which *New York v. FERC, supra,* 535 U.S. at page 24, makes reference. None of these areas of state control appears to us to affect interconnection agreements as set forth in the Standard Interconnection Agreement Order, and PUC has failed to explicate why they might do so.

Real party in interest CEERT, which has elected to file an answer to SCE's writ petition, approaches the matter somewhat differently than PUC. CEERT concedes that the field of interconnection agreements has been federally preempted, but asserts that what is relevant here is pricing policy with respect to recovery of interconnection costs, not interconnection itself. In this regard, CEERT argues that "it is common in utility regulation to find that utility options created under federal regulation are in turn curtailed as a result of the state's exercise of its regulatory authority." But, as with PUC's reliance on "siting" and other "traditional areas," CEERT does not explain or provide examples of a proper state exercise of regulatory authority curtailing federal regulation with respect to interconnection cost. Accordingly, its argument is of no assistance to the resolution of this matter.

We have reviewed PUC's *Interim Opinion* and Order Denying Rehearing to determine whether PUC exceeded its powers or jurisdiction. (Pub. Util. Code, § 1757, subd. (a)(1).) The *Interim Opinion* and Order Denying Rehearing interpret Public Utilities Code section 399.25 to permit a requirement that utilities pay up-front costs of system upgrades necessary to connect new sources of renewable energy to the grid. Because this interpretation is preempted by federal law, the portions of the decisions in which it appears must be annulled.

## DISPOSITION

California Public Utilities Commission Decisions Nos. 03-07-033 and 03-10-020 are annulled to the extent they purport to interpret Public Utilities Code section 399.25 to permit a requirement that utilities pay up-front costs of system upgrades required to connect new sources of renewable energy to the grid.

Ortega, Acting P. J., and Vogel, J., concurred.

A petition for a rehearing was denied September 27, 2004, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied January 19, 2005. Chin, J., did not participate therein.