384 F.3d 756
 PUBLIC UTILITY DISTRICT NO. 1 OF SNOHOMISH COUNTY, a municipal corporation in the State of Washington, Plaintiff-Appellant,
v.
DYNEGY POWER MARKETING, INC.; Reliant Energy Services, Inc.; Sempra Energy Trading Corp.; Sempra Energy Resources; Mirant Corporation; William Energy Marketing & Trading Company; Powerex Corporation; XCEL Energy, Inc.; NRG Energy,
Inc.; Cabrillo Power I, LLC; Cabrillo Power II, LLC; El Segundo Power LLC; Long Beach Generation, LLC; PG & E Energy Trading Holding Corporation; Duke Energy Trading and Marketing LLC, Defendants-Appellees.
 No. 03-55191.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted June 14, 2004.
 Filed September 10, 2004.
 
 Steve W. Berman and Sean R. Matt, Hagens Berman LLP, Seattle, WA, for the plaintiff-appellant.
 Terry J. Houlihan and Nora Cregan, Bingham McCutchen LLP, San Francisco, CA, Joel B. Kleinman, Dickstein Shapiro Morin & Oshinsky LLP, Washington, D.C., John M. Grenfell, Pillsbury Winthrop LLP, Peter H. Benzian, Latham & Watkins LLP, Jeffrey M. Shohet, Gray, Cary, Ware & Freidenrich, LLP, San Diego, CA, Theodore Spanos, Morgan, Lewis & Bockius, LLP, Bryan A. Merryman, White & Case LLP, Los Angeles, CA, J. Clifford Gunter, III, and Andrew Edison, Bracewell & Patterson LLP, Houston, TX, Douglas M. Butz, Butz Dunn Desantis & Bingham, San Diego, CA, Carlton A. Varner, Timothy B. Taylor, Sheppard, Mullin, Richter & Hampton LLP, San Diego, CA, for the defendants-appellees.
 Colin A. Yost, Asssistant Attorney General — Oregon, Salem, OR, and Ken Alex, Deputy Attorney General — California, San Francisco, CA, for Amici Curiae.
 Appeal from the United States District Court for the Southern District of California, Robert H. Whaley, District Judge, Presiding. D.C. No. CV-02-01993-RHW.
 Before: SCHROEDER, Chief Judge, CANBY, and TALLMAN, Circuit Judges.
 SCHROEDER, Chief Judge:
 
 
 1
 This litigation arises out of the California Energy Crisis of 2000-01, when shortages of power and high electricity prices caused blackouts and general turmoil in the electricity markets of the west coast. In this case, Public Utility District No. 1 of Snohomish County, Washington ("Snohomish"), a utility providing electricity to consumers in Washington state, has sued various generators and traders of wholesale electricity for violations of California state antitrust and consumer protection laws. Snohomish charges that the defendants manipulated the market and restricted electricity supplies in order to cause artificially high prices in the market from which Snohomish purchased power. Snohomish seeks treble damages and injunctive relief.
 
 
 2
 The district court held that the claims were preempted by federal law, which authorizes the Federal Energy Regulatory Commission ("FERC") to set wholesale electricity rates. Snohomish appeals, contending that FERC's policy of setting rates in accordance with market forces amounts to an abdication of rate making. Because FERC has exclusive jurisdiction over interstate sales of wholesale electricity, and continues to engage in regulatory activity, we affirm. See California v. Dynegy, Inc., 375 F.3d 831, 850-853 (9th Cir.2004); Pub. Utility Dist. No. 1 of Grays Harbor County Washington v. Idacorp, Inc., ___ F.3d ___, ___ (9th Cir. Aug. 10, 2004), Slip Op. at 10911-10919.
 
 BACKGROUND
 
 3
 Before 1996, FERC reviewed electricity rates that were cost-based. The primary factor in setting the rate was the cost of producing and transmitting the electricity. Power suppliers proposed rates by adding up their costs and accounting for an expected rate of return. FERC reviewed and approved tariffs that contained detailed breakdowns of costs and specified rates of return. See 18 C.F.R. § 35.1(a) (requiring utilities to file "rate schedules"); 18 C.F.R. § 35.2(b) (defining what information must be included in a "rate schedule"); 18 C.F.R. § 35.13(h)(22) (requiring utilities to state their expected rate of return). Utilities were also required to give a thorough explanation of "how the proposed rate or charge was derived." 18 C.F.R. § 35.12(b)(2)(i). These rate schedules had to be filed at least 60 days before the utility could charge the requested rate, and the rate could be implemented only after FERC approved it. See 18 C.F.R. §§ 35.2(e), 35.3(a). After a rate was approved, a utility could charge only the filed rate until a request to change the rate was submitted and approved by FERC. 16 U.S.C. § 824d(d); 18 C.F.R. § 35.13.
 
 
 4
 In 1996, California changed this cost-based system of setting wholesale electricity rates to a market-based system, where the rate was determined in a structured market. The California legislature passed Assembly Bill 1890, Cal. Pub. Util.Code § 330 et seq., in an effort to reduce the price of electricity by replacing cost-based rate regulation with rates that were determined by competitive forces. See California v. Dynegy, Inc., 375 F.3d at 835; Duke Energy Trading & Mktg., L.L.C. v. Davis, 267 F.3d 1042, 1045 (9th Cir.2001). The legislation created two non-governmental entities to operate markets and otherwise manage the sale of electricity: the California Power Exchange ("PX") and the California Independent System Operator ("ISO"). These entities were subject to FERC's regulation. Dynegy, Slip Op. at 8836.
 
 
 5
 The PX operated a market for the purchase and sale of electricity in the "day-ahead" and "day-of" markets. The price in these markets was set by evaluating bids submitted by market participants. A seller could submit a series of bids that consisted of price-quantity pairs representing offers to sell (e.g. 5 units at $50 each, but 10 units if the price is $100 each). Similarly, a buyer could submit a series of bids that consisted of price-quantity pairs representing offers to buy. The PX would then establish aggregate supply and demand curves and set the "market clearing price" at the intersection of the two curves. Then every exchange would take place at the market clearing price, even though some buyers had been willing to pay more and some sellers had been willing to sell for less.
 
 
 6
 The ISO managed the transmission network, managing imbalances between supply and demand and maintaining the reliability of the transmission grid. As part of these responsibilities, it operated a "real-time" or "spot" market used to balance supply and demand at precise points in time. For example, if customer demand for a particular hour was not met, then the ISO was required to procure power on the spot market to maintain the stability of the grid. In the markets the PX and ISO managed, rates for wholesale electricity rose dramatically during 2000 and 2001. This caused consumer utilities to pay record high prices to traders and generators.
 
 FACTUAL AND PROCEDURAL HISTORY
 
 7
 In this suit, Snohomish alleges that the defendants violated the Cartwright Act, Cal. Bus. & Prof.Code § 16720 et seq. (California's antitrust law), and California's Unfair Competition Law, Cal. Bus. & Prof.Code § 17200 et seq. The defendants are all generators and traders who sold electricity in the California wholesale market. (The proceedings against one defendant, PG & E Energy Trading Holding Corp., is under a bankruptcy court stay.) Snohomish alleges that the defendants withheld supply, waited until emergency conditions were declared and prices rose, and then offered their supply at the higher prices. Snohomish also alleges that the defendants engaged in a variety of sham transactions in order to manipulate and inflate prices. These transactions had colorful names like "Death Star" and "Get Shorty."
 
 
 8
 The consumer utilities that were the buyers in the California wholesale markets have instituted proceedings before FERC on these matters. FERC has investigated the defendants' practices, and issued an order that describes the market manipulation techniques Snohomish alleges, analyzes whether these practices violate any of the tariffs filed with FERC, and outlines appropriate remedies. See Am. Elec. Power Serv. Corp. et al., 103 FERC ¶ 61,345, 2003 WL 21480252, 9 (Jun. 25, 2003). The order provides a detailed discussion of the practices challenged here.
 
 
 9
 Snohomish's complaint alleged these practices caused Snohomish "to pay prices for electricity in excess of rates that would have been achieved in a competitive market." Snohomish asked the district court to enjoin the defendants from engaging in unlawful and unfair business acts, order the defendants to disgorge all monies wrongfully obtained, order the defendants to pay restitution, award compensatory and treble damages, and award costs, interest, and attorney's fees.
 
 
 10
 The district court granted the defendants' motion to dismiss, ruling under three alternative but related theories that it did not have jurisdiction to resolve the issues raised in Snohomish's complaint. The district court ruled that Snohomish's claims were barred by both the filed rate doctrine and by principles of field and conflict preemption. See Transmission Agency of N. Cal. v. Sierra Pac. Power Co., 295 F.3d 918, 929-30 (9th Cir.2002) (describing the filed rate doctrine); Ting v. AT&T, 319 F.3d 1126, 1136 (9th Cir.2003) (describing the doctrines of field and conflict preemption and citing cases). The district court held that granting the relief Snohomish requested would interfere with FERC's exclusive jurisdiction over the regulation of interstate wholesale energy rates because Snohomish sought damages stemming from the difference between the rates the defendants charged and hypothetical rates that, according to the complaint, would have "been achieved in a competitive market." Snohomish appealed.
 
 DISCUSSION
 
 11
 Snohomish argues that the preemption doctrines, upon which the district court relied, should not apply when marketbased rates are involved because the market, and not FERC, is determining the rates. The fundamental question in this case is whether, under the market-based system of setting wholesale electricity rates, FERC is doing enough regulation to justify federal preemption of state laws. The answer to this question is controlled by two recent decisions of this court: Dynegy, 375 F.3d 831, and Grays Harbor, ___ F.3d ___. Under the system at issue here, FERC has waived many of the requirements that applied under the cost-based system. For example, the actual prices are no longer filed with FERC 60 days before they can be charged and the utilities do not provide FERC with detailed schedules of their costs. Instead, the price of wholesale electricity is determined in the markets operated by the PX and the ISO.
 
 
 12
 FERC continued to oversee wholesale electricity rates, however, by reviewing and approving a variety of documents filed by the defendants, the PX, and the ISO. First, each seller was to file a market-based umbrella tariff, which "preauthorizes the seller to engage in market-based sales and puts the public on notice that the seller may do so." California v. British Columbia Power Exchange Corp. ("BC Power Exchange I"), 99 FERC ¶ 61,247, 2002 WL 32035504, 13 (May 31, 2002). FERC approved these market-based tariffs only upon a showing that the seller lacked or had mitigated its market power. Id. at *11; see also La. Energy & Power Auth. v. FERC, 141 F.3d 364, 365 (D.C.Cir.1998). The theory is that a seller cannot raise its price above the competitive level without losing substantial business to rival sellers unless the seller has market power, and therefore that FERC's determination that a seller lacks market power provides a "strong reason to believe" that sellers will be able to charge only just and reasonable rates. See Elizabethtown Gas Co. v. FERC, 10 F.3d 866, 871 (D.C.Cir.1993) (discussing the Natural Gas Act).
 
 
 13
 Second, FERC required each seller to file quarterly reports, which contained certain required information including the minimum and maximum rate charged and the total amount of power delivered during the quarter. FERC has found this requirement necessary to ensure that rates will be on file as required by FPA § 205(c), 16 U.S.C. § 824d(c), to allow FERC to evaluate the reasonableness of the charges as required by FPA § 205(a), 16 U.S.C. § 824d(a), and to allow FERC to continually monitor the seller's ability to exercise market power. BC Power Exchange I, 99 FERC¶ 61,247, 2002 WL 32035504, at *12.
 
 
 14
 Third, FERC reviewed and approved detailed tariffs filed by the PX and the ISO, which described in detail how the markets operated by each entity would function. Many of the rules governing market operations were originally submitted by the PX and the ISO for information purposes only, but FERC required that these protocols be filed with and approved by the Commission as part of the PX and ISO tariffs. Am. Elec. Power Serv. Corp. et al., 103 FERC ¶ 61,345, 2003 WL 21480252, at *9. Each participant in the PX and the ISO markets was required to sign an agreement acknowledging that the tariff filed by either the PX or the ISO would govern all transactions in that market.
 
 
 15
 After the energy crisis unfolded, FERC ordered wholesalers to disgorge profits that resulted from the kinds of practices Snohomish has alleged here. FERC found that many of these practices were prohibited by the protocols that were filed as part of the PX and ISO tariffs. See generally Am. Elec. Power Serv. Corp. et al., 103 FERC ¶ 61,345, 2003 WL 21480252.
 
 
 16
 This court has rejected Snohomish's argument that the preemption-related doctrines at issue do not apply when market-based rates are involved. Grays Harbor, ___ F.3d at ___, Slip Op. at 10911-10919. In Grays Harbor, we were confronted with issues that are nearly identical to those involved here. Id. at 10909 n. 3. The plaintiff in that case brought state-law contract claims against a company that sold wholesale electricity seeking rescission and reformation of a contract that was entered into at the height of the energy crisis when wholesale electricity prices were near their peak. The plaintiff alleged that the high prices were the result of market manipulation and asked the court to afford relief after determining "a price that reflects a fair price absent dysfunction, manipulation and the intentional withholding of electric power...." Id. at 10909. Our court concluded that the same three preemption-related doctrines that the district court relied on here required the dismissal of the claims in Grays Harbor. We concluded that the district court was precluded from giving the plaintiff the relief it sought because, to award that relief, the district court would have had to determine a "fair price." Id. at 10913. We held that this would interfere with FERC's exclusive jurisdiction to set wholesale rates and was therefore barred by field preemption, conflict preemption, and the filed rate doctrine. Id. at 10913, 10916, 10917, 10919.
 
 
 17
 Snohomish's claims in this case allege violations of state antitrust and unfair competition law rather than the state contract law claims involved in Grays Harbor, but Snohomish's claims also ask the district court to determine the rates that "would have been achieved in a competitive market." This is the same determination as the "fair price" determination that we held was barred by preemption principles in Grays Harbor. We therefore hold that Snohomish's claims are barred by the filed rate doctrine, by field preemption, and by conflict preemption.
 
 
 18
 Snohomish also requests injunctive relief, but our court has also held that this relief is barred by the filed rate doctrine and preemption principles. California v. Dynegy, Slip Op. at 8863-68. In Dynegy, we held that the State of California's claims for violations of California's unfair competition law, Cal. Bus. & Prof.Code § 17200 et seq., which included a claim for injunctive relief, were barred. Id. at 8839, 8863-67. We said: "remedies for breach and non-performance of FERC-approved operating agreements in the interstate wholesale electricity market fall within the exclusive domain of FERC." Id. at 8865-66. Here, FERC approved tariffs that included the market protocols that governed sales in the PX and ISO markets. FERC has found that most, if not all, of the practices alleged in Snohomish's complaint violated these protocols. Am. Elec. Power Serv. Corp. et al., 103 FERC ¶ 61,345, 2003 WL 21480252. Snohomish's claim for injunctive relief is therefore preempted. It "encroach[es] upon the substantive provisions of the tariff, an area reserved exclusively to FERC, both to enforce and to seek remedy." See Dynegy, Slip Op. at 8866 (citations omitted).
 
 
 19
 FERC approved tariffs that governed the California wholesale electricity markets. Therefore, if the prices in those markets were not just and reasonable or if the defendants sold electricity in violation of the filed tariffs, Snohomish's only option is to seek a remedy before FERC. We therefore affirm the district court's order dismissing Snohomish's claims for lack of jurisdiction.
 
 
 20
 AFFIRMED.