[No. D047697. Fourth Dist., Div. One. Feb. 26, 2007.]

WHOLESALE ELECTRICITY ANTITRUST CASES I & II

## COUNSEL

Lerach, Coughlin, Stoia, Geller, Rudman & Robbins, Leonard B. Simon, Pamela M. Parker and Frank J. Janecek, Jr., for Plaintiffs and Appellants Ruth Hendricks, People of the City and County of San Francisco, City of Oakland and County of Santa Clara.

Best, Best & Krieger, C. Michael Cowett, Robert J. Hanna, Mary E. Coburn, James P. Gilpin and William C. Pate for Plaintiffs and Appellants Borrego

Water District, Fallbrook Public Utility District, Helix Water District, Padre Dam Municipal Water District, Ramona Municipal Water District, Sweetwater Authority, Valley Center Municipal Water District, Vista Irrigation District, Yuma Municipal Water District, Metropolitan Transit Development Board, San Diego Trolley, Inc., and San Diego Transit Corporation.

Levine, Steinberg, Miller & Huver, Harvey R. Levine, Richard A. Huver; Patricia A. Meyer & Associates, Patricia A. Meyer, Marisa Janine-Page and Matthew T. Poelstra for Plaintiffs and Appellants Cruz Bustamante, Ruth Hendricks and Barbara Matthews.

Kiesel, Boucher & Larson and Raymond P. Boucher for Plaintiffs and Appellants Cruz Bustamante and Barbara Matthews.

Krause, Kalfayan, Benink & Slavens, James C. Krause, Ralph B. Kalfayan, David B. Zlotnick; Keegan, Macaluso & Baker, Patrick N. Keegan; and Hoyt E. Hart II for Plaintiff and Appellant Pamela Gordon.

Lieff, Cabraser, Heimann & Bernstein, William Bernstein, Joseph R. Saveri and Barry Himmelstein for Plaintiffs and Appellants Oscars Photo Lab, Pier 23 Restaurant and Mary L. Davis.

Dennis J. Herrera, City Attorney, and Theresa L. Mueller, Deputy City Attorney, for Plaintiff and Appellant City and County of San Francisco.

John A. Russo, City Attorney, Barbara Parker and Izetta C. R. Jackson, Deputy City Attorneys, for Plaintiff and Appellant City of Oakland.

Ann Miller Ravel, County Counsel, and Cheryl A. Stevens, Deputy County Counsel, for Plaintiff and Appellant County of Santa Clara.

Pillsbury, Winthrop, Shaw & Pittman, Douglas R. Tribble, Connie J. Wolfe, John M. Grenfell and Michael J. Kass for Defendants and Respondents Cabrillo Power I, LLC, Cabrillo Power II, LLC, Louis J. Dorey, Dynegy, Inc., Dynegy Marketing & Trading, Dynegy Power Marketing, Inc., El Segundo Power, LLC, Long Beach Generation, LLC, Matt K. Schatzman and Charles Watson.

Latham & Watkins, Daniel Murray Wall, Michael J. Weaver and Kimberly A. Hicks for Defendants and Respondents Sempra Energy, Inc., Sempra Generation and Sempra Energy Trading Corporation.

Coughlan, Semmer & Lipman, R. J. Coughlan, Jr.; Williams & Connolly and Stephen D. Raber for Defendant and Respondent AES Corporation.

Kirkland & Ellis, Tony L. Richardson, Jeffrey S. Davidson and James B. Ransom for Defendant and Respondent Morgan Stanley Capital Group, Inc.

## OPINION

**HUFFMAN, J.**—Plaintiffs and appellants Borrego Water District et al. (Borrego), a group of public entities and retail purchasers of electricity, filed this action for damages and other relief against defendants and respondents AES Corporation et al. (AES), a number of companies and their subsidiaries which are generators, sellers, or traders of electricity at wholesale (defendants). In their master complaint filed in 2002 in these coordinated actions, plaintiffs allege violations of California's antitrust laws (Bus. & Prof. Code,[1] § 16720; hereafter the Cartwright Act), as well as violations of California's unfair competition law (§ 17200 et seq.; hereafter the UCL).[2] These allegations all arise out of market conditions and events during the California energy crisis of 2000 and onward, relating to claims for damages and injunctive relief for anticompetitive activity and/or unfair competition in the wholesale electricity market.

In response to the filing of this action, and after a delay of several years due to removal to federal court and remand to state court, all defendants brought and renewed a joint demurrer to the master complaint, on the grounds of lack of jurisdiction. Defendants argued the subject matter of the master complaint was preempted by federal law that had occupied the field of wholesale electricity market control and regulation, because plaintiffs' theories of recovery would inevitably require the superior court to determine reasonable rates for wholesale power sales. Defendants further argued that a regulatory doctrine, the filed rate doctrine, barred the filing of this action for damages. (See *Public Utility v. Dynegy Power Marketing* (9th Cir. 2004) 384 F.3d 756 (*Snohomish*); *Public Utility, Grays Harbor, WA v. IDACORP* (9th Cir. 2004) 379 F.3d 641, 647 (*Grays Harbor*).) The trial court agreed and sustained the demurrer without leave to amend.

Plaintiffs appeal, contending the ruling was erroneous because California case law, *Younger v. Jensen* (1980) 26 Cal.3d 397 [161 Cal.Rptr. 905, 605 P.2d 813] (*Younger*) and *Spielholz v. Superior Court* (2001) 86 Cal.App.4th 1366 [104 Cal.Rptr.2d 197] (*Spielholz*), should support a finding that state law can provide an independent ground for regulation of the anticompetitive or unfair

---

[1] All statutory references are to this code unless otherwise stated.

[2] Sections 17200 through 17209 are commonly referred to as the unfair competition law or UCL. (*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 558, fn. 2 [71 Cal.Rptr.2d 731, 950 P.2d 1086].)

conduct of defendants, through an award of antitrust damages, such that there should be no finding of federal preemption. Plaintiffs found further support for their theory of general applicability of state antitrust laws in the context of electricity market disputes in the United States Supreme Court case of *Otter Tail Power Co. v. United States* (1973) 410 U.S. 366 [35 L.Ed.2d 359, 93 S.Ct. 1022] (*Otter Tail Power*).

Our analysis of the master complaint and pertinent case law convinces us that the trial court correctly applied the doctrines of field and conflict preemption in sustaining the demurrer without leave to amend. We find additional support for that conclusion in the filed rate doctrine, relied on by the trial court as an alternate ground for its ruling on demurrer. (*California ex rel. Lockyer v. Dynegy, Inc.* (9th Cir. 2004) 375 F.3d 831, 852–853 (*Dynegy*).) We affirm the judgment of dismissal.

## FACTUAL AND PROCEDURAL BACKGROUND

### A

### Master Complaint; Coordinated Proceedings

Since 2001, these coordinated proceedings have included a total of six actions originating both in San Diego and in other counties. Plaintiffs, the People of the State of California (suing through city attorneys) and 21 retail purchasers of electricity, filed their master complaint in 2002. These plaintiffs did not purchase power directly from defendants, which are wholesalers, but rather from several investor-owned utilities, including San Diego Gas & Electric and Southern California Edison. Although several of the plaintiffs originally sought class certification, those matters were apparently stayed pending the demurrer proceedings and are not before us on this appeal.[3]

A number of major named defendant groups have settled this case and are not participants in this appeal (Reliant Energy, Duke Energy, Williams Energy Marketing & Trading, and Mirant Americas Energy, etc.).[4] The remaining defendants, and their subsidiaries for whose activities they are sued, are four

---

[3] Certain of the plaintiffs, public officials whom we denote the Bustamante group, do not join in the antitrust claims but make additional UCL claims based on Penal Code violations. (Pen. Code, §§ 395, 396.) The same basic theories pertain to all the causes of action and we need not discuss these additional distinctions separately.

[4] Apparently, those settlements with those other defendants also included other related claims, and are not informative with regard to the issues on this appeal.

groups of generators, sellers, or traders of electricity at wholesale (Dynegy, Inc.; Morgan Stanley Capital Group, Inc.; AES Corporation; and Sempra Energy, Inc.).[5]

Plaintiffs assert a number of alleged violations of the Cartwright Act (first cause of action) and the unfair and/or unlawful prongs of the UCL statute (second and third causes of action), occurring around 2000, during a period of intense governmental and commercial activity to deregulate the electricity markets pursuant to 1996 state legislation, Public Utilities Code section 330 et seq. (*Dynegy, supra,* 375 F.3d 831, 835 ["Noting the energy industry restructuring already underway, the California Legislature decided that re-shaping the market for California energy could help provide competitive, lower cost and reliable electricity service, while preserving the state's commitment to developing diverse, environmentally sensitive electricity resources. [Citation.] Assembly Bill 1890 ('AB 1890') established the legal structure for the deregulation and restructuring plan"].)

In the introductory allegations of the master complaint, plaintiffs allege that they are entitled to recover damages and other equitable and injunctive relief, based on injuries incurred during this period and "arising from defendants' manipulation, distortion, and corruption of California's deregulated wholesale electricity market. Defendants' unfair and unlawful business practices and illegal restraints of trade included combining to withhold supply from electricity markets and colluding to fix electricity prices. This conduct forced electricity users to pay electricity prices based not on competitive market forces, but prices which were grossly inflated due to defendants' conduct. [¶] This action seeks to remedy that conduct, which caused widespread electricity shortages and astronomical prices. Defendants' manipulation of what was supposed to be a competitive market for wholesale electricity harmed all Californians and destabilized the California economy, which depends on a reliable supply of competitively priced energy. The total harm caused by defendants' conduct is, at this point, unknown. . . ."

Plaintiffs' master complaint cites to several examples of defendants' alleged exploitation of the changes since 1996 in the energy market's new regulatory and economic structure. These include practices of "conspiring to withhold the supply of energy into the PX and ISO [power exchange and Independent System Operator, nonprofit public benefit corporations established by the Legislature] markets and to manipulate the price at which

---

[5] In addition to suing these four major employers in the business of wholesale electric trading and marketing, plaintiffs named three individual defendants, who were management employees of the Dynegy group. No separate allegations are made about the individual defendants and we refer to all defendants collectively.

wholesale energy was sold." Plaintiffs allege this constituted "gaming the market" to create false shortages and prevent the sale of electricity at competitive rates.[6]

The master complaint describes how the ISO was charged with balancing the supply of energy offered for sale into the market with demand at certain points in time, and was required to purchase energy on the spot market to meet any shortfalls. This spot market was susceptible to manipulation regarding the price of wholesale energy, which was set by the "market clearing price," or the highest price offered for sale of energy necessary to meet the load. This scheme was supposed to promote competition to attract new sources of power and lower the price of electricity, but according to plaintiffs, it was subject to abuse.

Additionally, defendants' communications and information sharing were alleged to be made for the purpose of and having the effect of manipulating supply and fixing prices. Defendants "manipulated supply such that the ISO was forced to issue shortage warnings during the Summer of 2000 even though the State had sufficient generating capacity. Defendants accomplished this by withholding supply from the PX and ISO markets, thus creating artificial shortages of electricity which, in turn, raised the market clearing prices on the wholesale energy markets. Much of this withholding was executed by simply shutting down or restricting the output of operational electricity generators. . . . [¶] This sort of activity provided the pretext—electricity shortages—for defendants' collusive and outrageous sales prices offered into the wholesale energy markets operated by the PX and ISO. From their respective trading floors, defendants coordinated the prices for electricity they offered for sale, otherwise known as 'bid rigging.' "

Plaintiffs therefore alleged that defendants' conduct departed from a competitive model, and they could "wield 'market power,' *i.e.,* the ability to control the market price." This conduct "materially raised electricity prices in the PX and ISO markets, which in turn, resulted in higher retail prices to consumers." The relief sought included actual and treble damages, restitution, civil penalties, and injunctive relief.

## B

### Demurrer/Opposition

In June 2005, after remand from federal court, defendants renewed their joint demurrer, asserting a lack of jurisdiction in the superior court, based on

---

[6] The ISO continues to manage the wholesale electricity market, but the PX is no longer in operation. Plaintiffs' allegations relate to the period during which the PX was still participating in the market.

federal preemption, as well as failure to state the causes of action. Defendants asserted plaintiffs' claims, based on conduct occurring in the wholesale energy market, cannot be adjudicated in state court because that is a field which is regulated by the federal government through the Federal Power Act (FPA; 16 U.S.C. § 791a et seq.) and placed within the exclusive authority of the Federal Energy Regulatory Commission (FERC). Defendants relied on federal case law holding that state law claims arising from wholesale transactions in the interstate electricity market are preempted under the FPA and that the filed rate doctrine applies to rates regulated under the FPA. (*Snohomish, supra,* 384 F.3d 756; *Grays Harbor, supra,* 379 F.3d 641, 647.)

Defendant argued the cases cited by plaintiffs as precluding a finding of preemption, such as *Younger, supra,* 26 Cal.3d 397, and *Spielholz, supra,* 86 Cal.App.4th 1366, were distinguishable and more limited than plaintiffs believed. Opposition and reply papers were filed, supported by extensive judicially noticeable material from FERC records.[7]

At oral argument in the trial court, defendants responded to plaintiffs' theories with the observation that there were ongoing refund requests before FERC by one of the defendants' subsidiaries, San Diego Gas & Electric, and defendants contended FERC was the proper forum. Plaintiffs continued to argue that in light of the various changes in the FERC regulatory process, from filed rates to a market-based type of regulation, Congress could not have intended to preempt the field when it enacted the FPA. Plaintiffs relied on *Younger, supra,* 26 Cal.3d 397, to contend concurrent state antitrust regulation in the wholesale market was appropriate, also citing to a related case in which a federal district court judge had observed that it was possible to establish a violation of the Cartwright Act without reference to the FPA's " 'just and reasonable' " rates standard. (*Hendricks v. Dynegy Power Marketing, Inc.* (S.D.Cal 2001) 160 F.Supp.2d 1155, 1163 (*Hendricks*).) In plaintiffs' view, it was possible to establish damages for anticompetitive conduct by defendants that were not measured by rate regulation standards. Plaintiffs contended that antitrust damages should be measured by what price the market would have set if anticompetitive forces were not operating, as distinguished from the

---

[7] Plaintiffs appropriately request judicial notice on appeal of various FERC proceedings and decisions in the record, outlining the scope of its jurisdiction as granted by the FPA (16 U.S.C. § 791a et seq.). These orders and decisions deal with rate schedules and proposed market-based rates and tariffs, and are submitted by plaintiffs to provide examples of FERC's duties to review whether rates and rate-related practices are just and reasonable, and to provide remedies for violations. (16 U.S.C. §§ 824d, 824e.) We need not discuss several of plaintiffs' arguments made below, which are not pursued on appeal, such as the purported distinction between the roles of sellers and other participants in the market, such that "at a minimum the case should proceed against traders and generators."

FERC standard of a just and reasonable rate, which was tied to how much money defendants were entitled to be making. The matter was taken under submission.

## C

### Ruling

After oral argument, the trial court issued its order, setting forth its reasoning as follows. First, the court granted the respective requests for judicial notice of rulings and orders issued by FERC. The demurrer was sustained on the basis that all claims were preempted and *Younger, supra,* 26 Cal.3d 397, was distinguishable. The court primarily relied on the authority of a Ninth Circuit Court of Appeals decision, *Snohomish, supra,* 384 F.3d 756, to conclude that plaintiffs' claims and prayer for relief would impermissibly require a "fair price" determination, already found to be barred by preemption principles in *Grays Harbor, supra,* 379 F.3d 641. The court concluded the field preemption and conflict preemption principles barred each of plaintiffs' claims.

Further, the trial court rejected plaintiffs' argument that *Otter Tail Power, supra,* 410 U.S. 366, would bar a finding of preemption, "because that case concerned federal antitrust laws and not state antitrust laws as Plaintiffs allege in their Master Complaint." The court further noted that in light of its finding that preemption bars plaintiffs' claims, it was not required to reach the issue of the applicability of the filed rate doctrine; nevertheless, those principles would bar these claims (relying on, e.g., *Snohomish, supra,* 384 F.3d 756; *Grays Harbor, supra,* 379 F.3d 641; *Dynegy, supra,* 375 F.3d 831). These rulings were dispositive and the master complaint was dismissed.

Plaintiffs, through liaison counsel, timely filed their notice of appeal.

### DISCUSSION

The main thrust of the complaint is that defendants' conduct, their alleged "manipulation, distortion and corruption" of the wholesale electricity market in California, "forced electricity users to pay electricity prices based not on competitive market forces, but prices which were grossly inflated due to defendants' conduct," thereby giving rise to an entitlement to antitrust damages and unfair competition remedies in favor of plaintiffs. To avoid the effect of federal preemption in this heavily regulated area, plaintiffs seek to distinguish between the regulatory authority granted to FERC to order compliance with its policies, such as by ordering refunds to electricity

consumers, and the types of damages and other relief recoverable under the Cartwright Act and/or the UCL.

We first set forth rules regarding federal preemption in this factual and legal context. We then address the filed rate doctrine.

## I

## *QUESTIONS OF LAW PRESENTED*

To address these issues as resolved on demurrer, we apply basic standards of review. "We review the trial court's sustaining of a demurrer without leave to amend de novo, exercising our independent judgment as to whether a cause of action has been stated as a matter of law. [Citations.] We 'give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.]' [Citation.] A judgment based on a dismissal must be affirmed if any of the grounds for demurrer raised by the defendant is well-taken and disposes of the complaint. [Citation.]" (*Gallivan v. AT&T Corp.* (2004) 124 Cal.App.4th 1377, 1381 [21 Cal.Rptr.3d 898].)

"When the issues regarding federal preemption involve undisputed facts, it is a question of law whether a federal statute or regulation preempts a state law claim and, on appeal, we independently review a trial court's determination on that issue of preemption. [Citations.]" (*Smith v. Wells Fargo Bank, N.A.* (2005) 135 Cal.App.4th 1463, 1476 [38 Cal.Rptr.3d 653] (*Smith*).)

A preliminary question of law we must address is whether plaintiffs are entitled to claim the benefit of "the general rule disfavoring implied preemption." (*Southern Cal. Edison Co. v. Public Utilities Com.* (2004) 121 Cal.App.4th 1303, 1311–1312 [18 Cal.Rptr.3d 435] (*Southern California Edison*).) This is sometimes termed a "presumption against preemption. 'We apply a presumption against federal preemption unless the state attempts to regulate an area in which there is a history of significant federal regulation.' [Citation.]" (*Grays Harbor, supra*, 379 F.3d 641, 648, fn. 7.) Plaintiffs rely on *Smith, supra*, 135 Cal.App.4th 1463, to argue that the Cartwright Act may provide alternative schemes of regulation of wholesale electricity markets, to the extent that such claims are not inconsistent with federal preemption in this area. They hinge this claim upon their perception that antitrust damages arising from defendants' anticompetitive conduct are different in nature from any penalties or refunds that FERC might order resulting from the same type of conduct. They argue the party claiming federal preemption (defendants) have the burden to show specific state law claims are preempted. (*Smith, supra*, at p. 1475.)

In response, defendants cite to *Southern California Edison, supra,* 121 Cal.App.4th 1303, to say that the "presumption against preemption" is "characteristically applied where the field is one that the states have traditionally occupied and regulated. [Citation.] The presumption 'is not triggered when the state regulates in an area where there has been a history of significant federal presence. [Citation.]' [Citation.] Inasmuch as the field of interconnection [wholesale electricity distribution] agreements has a history of significant federal presence, the presumption against preemption is not applicable here." (*Id.* at pp. 1311–1312.) We agree with those observations and those of the court in *Grays Harbor, supra,* 379 F.3d 641, 648, footnote 7, that "[t]his presumption is almost certainly not applicable here because the federal government has long regulated wholesale electricity rates."

We therefore seek to examine, free from any such presumption against preemption, the respective merits of the arguments by both plaintiffs and defendants regarding the application of preemption principles here.

## II

### *PREEMPTION PRINCIPLES*

■ As set forth in *Smith, supra,* 135 Cal.App.4th 1463, 1476, our task is to examine "the precise language of the federal law or regulation to determine whether a particular state law claim is preempted. [Citations.] 'As to each state law claim, the central inquiry is whether the legal duty that is the predicate of the [claim] constitutes a requirement or prohibition of the sort that federal law expressly preempts. [Citations.]' [Citation.]" (*Ibid.*)

To carry out this analysis of the scope of preemption in the energy/electricity context, we first outline the leading case authority dealing with similar claims arising out of the California energy crisis in the wholesale electricity market, as issued by the Ninth Circuit Court of Appeals. We then compare the nature of the antitrust/UCL damages requested, to the remedial powers allocated by the FPA (16 U.S.C. § 791a) to FERC (formerly the FPC (Federal Power Commission) [see hist. & stat. notes, 16 U.S.C.A. (2000) foll. § 792, p. 78]). We note that although preemption principles are closely intertwined with the "filed rate doctrine," which is central to FERC's operations, we may nevertheless discuss them separately. (*California ex rel. Lockyer v. F.E.R.C.* (9th Cir. 2004) 383 F.3d 1006, 1011 (*Lockyer*).) The reason is that the historic filed rate doctrine is undergoing fast-paced evolution in the context of energy deregulation, such as the aftermath of the 1996 California legislation with which we are dealing. (Pub. Util. Code, § 330 et seq.; *Dynegy, supra,* 375 F.3d 831, 852–853.) We will address this evolution to the extent necessary in part III, *post.*

Finally, with this background set forth, we will analyze plaintiffs' arguments that certain alternative federal and state authority shows that antitrust relief in the state courts is not inconsistent with the grant of federal authority to regulate the wholesale electricity market. (E.g., *Younger, supra,* 26 Cal.3d 397; *Otter Tail Power, supra,* 410 U.S. 366.)

A

Recent Ninth Circuit Authority

In *Grays Harbor, supra,* 379 F.3d 641, 644, the Ninth Circuit Court of Appeals built upon earlier authority (*Dynegy, supra,* 375 F.3d 831), to address "contract-related claims against energy wholesalers by a public utility which contends it was forced to pay exorbitant prices for electricity." (*Grays Harbor, supra,* at p. 644.) The court upheld a district court dismissal of such contract claims on preemption grounds. It first set forth basic preemption principles: "As an initial matter, it is clear that the Federal Power Act (the 'FPA') grants FERC ' "*exclusive* authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce." ' [Citations.] Through the FPA, ' "Congress meant to draw a bright line easily ascertained, between state and federal jurisdiction. . . . This was done in the Power Act by making [FERC] jurisdiction plenary and extending it to all wholesale sales in interstate commerce except those which Congress has made explicitly subject to regulation by the States." ' [Citation.] This power includes the exclusive authority to determine the reasonableness of wholesale rates. [Citations.]" (*Grays Harbor, supra,* 379 F.3d 641, 646–647.)

In *Dynegy, supra,* 375 F.3d 831, 839, the court explained the operation of the ISO tariffs filed with FERC, and said that "the ISO tariff binds the companies to important obligations and duties that are relevant and necessary to the state law claim." (*Ibid.*) For example, "the ISO must file schedules showing its rates and charges, and the practices and regulations affecting such charges. [Citation.] The filing enables FERC to determine whether the ISO rules and regulations pertaining to those charges are reasonable, as required by the FPA. [Citation.] Once filed with a federal agency, such tariffs are the 'equivalent of a federal regulation.' [Citations.] . . . Besides specifying the generators' responsibilities, the tariff also details penalties and remedies for non-compliance." (*Ibid.*)

Even though the unsuccessful plaintiff in *Grays Harbor* was claiming contract damages (nominally state law causes of action), the court of appeals read its complaint as seeming, impermissibly, "to require the district court, at some point, to determine the fair price of the electricity that was delivered under the contract. This determination is clearly within FERC's jurisdiction

for determining the reasonableness of wholesale rates. [Citations.] At the very least, the requested relief intrudes on an 'identifiable portion' of a field that the federal government has occupied and addresses a matter that is 'in any way regulated by the federal government.' [Citation.]" (*Grays Harbor, supra*, 379 F.3d at p. 648.)

The court of appeals also rejected the plaintiff's claim that "market-based rates are not within FERC's exclusive jurisdiction over wholesale rates." (*Grays Harbor, supra*, 379 F.3d 641, 649.) The federal court acknowledged that FERC had changed its policies from requiring filed rates to allowing market-based rates. However, traditional preemption principles continue to apply because, "by asking the court to set a fair price, Grays Harbor is invoking a state rule (specifically, contract law) that would interfere with the method by which the federal statute was designed to reach its goals (specifically, FERC regulation of wholesale electricity rates). To permit Grays Harbor to receive in its court action what is essentially a refund would create a conflict with FERC's authority over wholesale rates. And such a result would make state law stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress under the FPA." (*Id.* at p. 650, fn. omitted.) The court ruled the contract claims would interfere with FERC's exclusive jurisdiction to set wholesale rates and were barred by field preemption, conflict preemption, and the filed rate doctrine. (*Id.* at pp. 648, 650, 651.)

In the next case, *Snohomish, supra*, 384 F.3d 756, the court extended the reasoning in *Grays Harbor, supra*, 379 F.3d 641, from the contract field to the antitrust field. The federal court found that preemption rules applied to preclude a California state law antitrust court action that was essentially challenging market-based rates. The court explained its reasoning: "The fundamental question in this case is *whether, under the market-based system of setting wholesale electricity rates, FERC is doing enough regulation to justify federal preemption of state laws*. The answer to this question is controlled by two recent decisions of this court: *Dynegy, [supra,]* 375 F.3d 831, and *Grays Harbor, [supra,]* 379 F.3d 641. Under the system at issue here, FERC has waived many of the requirements that applied under the cost-based system. For example, the actual prices are no longer filed with FERC 60 days before they can be charged and the utilities do not provide FERC with detailed schedules of their costs. Instead, the price of wholesale electricity is determined in the markets operated by the PX and the ISO. [¶] FERC continued to oversee wholesale electricity rates, however, by reviewing and approving a variety of documents filed by the defendants, the PX, and the ISO." (*Snohomish, supra*, 384 F.3d 756, 760, italics added.)

The federal court of appeals then gave several examples of how FERC was continuing to exercise its regulatory power to a sufficient degree to justify continued federal preemption. These included considering applications for approval of market-based tariffs upon a showing that the seller lacked or had mitigated its market power; requiring power sellers to file quarterly reports, which contained certain required information including the minimum and maximum rate charged and the total amount of power delivered during the quarter; and reviewing "detailed tariffs filed by the PX and the ISO, which described in detail how the markets operated by each entity would function." (*Snohomish, supra*, 384 F.3d 756, 761.)

Next, the court in *Snohomish, supra*, 384 F.3d 756, described how FERC had taken action to order wholesalers to disgorge profits that resulted from the anticompetitive practices involved in that particular case. From all of these factors, the federal court decided that preemption-related doctrines would continue to apply when market-based rates are involved, as laid out in *Grays Harbor, supra*, 379 F.3d 641. (*Snohomish, supra*, 384 F.3d at pp. 760–761.) Even though *Grays Harbor* was a contract case, the same reasoning applied to the claims by Snohomish, alleging violations of state antitrust and unfair competition law. The court concluded that both types of claims sought to have the district court "determine the rates that 'would have been achieved in a competitive market.' This is the same determination as the 'fair price' determination that we held was barred by preemption principles in *Grays Harbor*. We therefore hold that Snohomish's claims are barred by the filed rate doctrine, by field preemption, and by conflict preemption." (*Snohomish, supra*, at p. 761.) The plaintiff's proper course of action was to apply to FERC to redress its claims that the prices in the wholesale electricity markets were not just and reasonable or that the defendants sold electricity in violation of the filed tariffs. Snohomish's state antitrust claims were dismissed for lack of jurisdiction. (*Id.* at p. 762.)

B

Nature of Remedies: FERC Regulatory Scheme/Antitrust
Damages

 Notwithstanding the above authority, plaintiffs contend that they may continue to pursue their claims for relief, damages pursued under the Cartwright Act and the UCL (alleging unlawful or unfair conduct), as alternative theories of recovery. However, in their reply brief, plaintiffs appear to admit that injunctive relief is not available, although their position is unclear. In any case, in *Snohomish, supra*, 384 F.3d 756, the court noted

such injunctive relief has been held to be barred in this context by preemption principles, as well as the filed rate doctrine. (*Id.* at pp. 761–762; *Dynegy, supra,* 375 F.3d at pp. 849–853.) Ninth Circuit cases have held that injunctive relief under the UCL in this context of energy regulation is preempted, because it would " 'encroach[] upon the substantive provisions of the tariff, an area reserved exclusively to FERC, both to enforce and to seek remedy.' " (*Snohomish, supra,* at p. 762; see *Dynegy, supra,* at pp. 836, 852.)

■ We therefore focus upon plaintiffs' remaining claims for antitrust damages for the defendants' anticompetitive conduct. "[T]he central purpose of the antitrust laws, state and federal, is to preserve competition. It is competition—not the collusive fixing of prices at levels either low or high—that these statutes recognize as vital to the public interest." (*Knevelbaard Dairies v. Kraft Foods, Inc.* (9th Cir. 2000) 232 F.3d 979, 988 (*Knevelbaard*).)

■ Plaintiffs' arguments require a comparison of antitrust relief to the remedies available from FERC under the FPA. One of the elements of standing to seek antitrust damages for anticompetitive conduct is a sufficient showing of injury with respect to: " '(1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages.' " (*Knevelbaard, supra,* 232 F.3d 979, 987.) A court must " 'evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them.' [Citation.]" (*Ibid.*; see *Kolling v. Dow Jones & Co.* (1982) 137 Cal.App.3d 709, 723 [187 Cal.Rptr. 797] [antitrust standing is required under the Cartwright Act].)

■ It is well accepted that damages awards in antitrust cases may not be based upon "sheer guesswork or speculation." (*Suburban Mobile Homes, Inc. v. AMFAC Communities, Inc.* (1980) 101 Cal.App.3d 532, 545 [161 Cal.Rptr. 811].) Rather, a plaintiff seeking such damages must establish to a reasonable probability that there was some causal connection between defendant's wrongful act and the damages alleged, such as lost profits. (*Ibid.*) "Once that has been accomplished, the jury will be permitted to act upon probable and inferential proof and to 'make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly.' [Citation.]" (*Ibid.*)

Plaintiffs say they can prove an entitlement to antitrust damages in state court, on the basis that the injuries they sustained as consumers from the

anticompetitive acts of defendants are mainly unrelated to FERC's normal duties of regulating rates and tariffs for the delivery of electricity on a wholesale basis. Plaintiffs believe they can show all the elements of "antitrust injury," i.e., " '(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent.' " (*Knevelbaard, supra,* 232 F.3d 979, 987.) Plaintiffs believe that the injury they allege is distinct from the high energy prices allegedly caused by defendants' actions in creating collusive supply, demand, and price manipulation. They say their claims "are based on duties and obligations that arise entirely independently of any 'tariff' relevant to this case." However, they admit that if FERC were to award any refunds, these would have to be offset against any court award of antitrust or UCL damages, and vice versa.

Defendants rely on the FPA statutory scheme as preempting the field, according to the basic principles explained in *Lockyer, supra,* 383 F.3d 1006, 1011, as follows: "The Federal Power Act governs the transmission and wholesale sales of electrical energy in interstate commerce. [Citation.] Pursuant to its authority under the FPA, FERC has exclusive jurisdiction over interstate wholesale power rates. [Citations.] The FPA requires that all rates for the transmission and sale of wholesale electricity be filed with FERC and published for public review. [Citation.] FERC is obligated to ensure that wholesale power rates are 'just and reasonable,' [citation], and applied in a non-discriminatory manner, [citations]. Indeed, FERC's authority to determine whether wholesale rates are 'just and reasonable' is exclusive. [Citation.]" (*Lockyer, supra,* at p. 1011.) As explained in *Dynegy,* the wholesale producers' filings will enable FERC "to determine whether the ISO rules and regulations pertaining to those charges are reasonable, as required by the FPA. [Citation.] Once filed with a federal agency, such tariffs are the 'equivalent of a federal regulation.' [Citations.]" (*Dynegy, supra,* 375 F.3d at p. 839.)

■ Defendants accordingly argue that the FPA preempts this field and requires that any such relief be requested from FERC, such as refunds to purchasers. They point to 16 United States Code section 824d(a) et seq., providing that FERC is charged with regulating and disclosing "just and reasonable rates" as follows: "All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful." (16 U.S.C. § 824d(a).) Likewise, in 16 United States Code section 824d(c), FERC is authorized to

require public utilities to file and disclose "schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services."

FERC also has the power under 16 United States Code section 824e(a) to prohibit "[u]njust or preferential rates, etc." and to order remedies as follows: "Whenever the Commission, after a hearing held upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affected such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order." In 16 United States Code section 824e(b), the commission is entitled to prescribe the effective dates of refunds that it orders. We believe the broad scope of these statutes must invoke the rule that antitrust damages will not be proper where there is a risk of duplicative recovery. The nature of plaintiffs' alleged injury (equivalent to an entitlement to refunds) is apparently inseparable from the type of injury the antitrust laws were intended to forestall. (*Knevelbaard, supra*, 232 F.3d 979, 987.)

Plaintiffs, however, offer several reasons why these applications of preemption theory were wrongly decided or distinguishable from their claims, as we next discuss.

### C

#### Alternative Approaches Relied on by Plaintiffs to Preclude a Preemption Finding

Plaintiffs rely on California law (*Younger, supra*, 26 Cal.3d 397; *Spielholz, supra*, 86 Cal.App.4th 1366) to argue no federal preemption principles apply here. They also cite to *Otter Tail Power*, as representing the concept that activities coming under the jurisdiction of a regulatory agency "nevertheless may be subject to scrutiny under the antitrust laws." (*Otter Tail Power, supra*, 410 U.S. 366, 372.) Plaintiffs seemingly argue for a "back to basics" approach to preemption, based on this older case law focusing on congressional intent. Further, they point to language in the *Lockyer* opinion (*Lockyer, supra*, 383 F.3d 1006) as showing that the federal courts here recognized that FERC is not doing a good enough job, such that alternative remedies should

now be allowed through this state antitrust action. We discuss these theories in turn.

In *Younger, supra,* 26 Cal.3d 397, the court explained that an agency such as the FPC (now FERC) must take antitrust considerations into account when it determines " 'public interest' " and " 'public convenience and necessity,' " but the agency "has 'no power to insulate utilities under its regulation from the operation of the antitrust acts, or to determine when an antitrust violation has taken place. *Otter Tail Power*[, *supra,*] 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 . . . .' [Citations.]" (*Younger, supra,* at pp. 407–408.) The Supreme Court decided that a parallel piece of legislation, the Natural Gas Act (15 U.S.C. § 717 et seq.), did not preclude the state Attorney General from investigating possible violations of California antitrust law. It reasoned that the act did not expressly prohibit investigation or other activity regarding state antitrust laws, and that such practices could be consistent with the federal counterparts. (*Younger, supra,* 26 Cal.3d at p. 408.) The Supreme Court therefore found no federal preemption of the state Attorney General's investigation of alleged conduct such as " 'price fixing, monopolization, divisions of markets, and restraint of trade,' " and said "[h]ypothetical conflict between federal law and enforcement of California antitrust provisions within the scope of the investigation, even if assumed, is not ground for preemption since it may never arise in fact. [Citations.]" (*Ibid.*) Instead, state investigations into possible violations of California statutes that were in harmony with federal antitrust laws were deemed to be permissible and not preempted. (*Id.* at p. 409.)

Plaintiffs argue the authority of *Younger, supra,* 26 Cal.3d 397, 409, is not restricted to authorizing state antitrust investigation procedures, but should also extend to authorizing state antitrust enforcement actions, such as this complaint. We disagree, because more than a "[h]ypothetical conflict between federal law and enforcement of California antitrust provisions" (*id.* at p. 408) is present here, in light of the extensive nature of the FERC regulatory scheme over the wholesale electricity market. In the FPA, we are presented with " ' "a bright line easily ascertained, between state and federal jurisdiction. . . . This was done in the Power Act by making [FERC] jurisdiction plenary and extending it to all wholesale sales in interstate commerce except those which Congress has made explicitly subject to regulation by the States." ' [Citations.] This power includes the exclusive authority to determine the reasonableness of wholesale rates. [Citations.]" (*Grays Harbor, supra,* 379 F.3d 641, 646–647.) Plaintiffs cannot explain why the trial court would not have to second-guess FERC rate determinations in fixing antitrust damages to punish defendants for the alleged anticompetitive conduct, because such conduct would directly affect the reasonableness of the rates charged.

In the UCL context, in *Spielholz, supra*, 86 Cal.App.4th 1366, those plaintiffs were allowed to proceed with false advertising allegations that a telecommunications carrier had falsely advertised a "seamless calling area" existed, where in reality, there were gaps where wireless telephone users were unable to connect calls. The Court of Appeal found no federal preemption of such claims, because the main allegations dealt with false advertising, such that any effect on rates was merely incidental. Here, however, as stated by the trial court, "This can be contrasted to the instant case, involving the FPA, where Plaintiffs' allegations concern conduct directly related to rates charged and ultimately paid." We agree with the trial court's analyses of the California case law claims, because plaintiffs have been unable to show why the alleged anticompetitive conduct by defendants inflicted any different kind of injury on them, that is separate from the rates charged and ultimately paid. This is not a case in which incidental damages are claimed to arise from conduct that is not covered by the federal legislation, such as false advertising.

In its ruling, the trial court also rejected the argument that *Otter Tail Power* would bar a finding of preemption, since that case concerned federal antitrust laws and not state antitrust laws. There, the Supreme Court relied on legislative history to find nothing in the FPA that would "insulate electric power companies from the operation of the antitrust laws." (*Otter Tail Power, supra*, 410 U.S. 366, 374–375.) Rather, to the extent that voluntary business relationships are utilized to control the interstate distribution of power (as opposed to governmental regulation), "courts must be hesitant to conclude that Congress intended to override the fundamental national policies embodied in the antitrust laws." (*Ibid.*) The court in *Otter Tail Power* held there is no basis to conclude that the limited power granted to the FPC/FERC to regulate certain aspects of electrical supply (e.g., ordering interconnections of power lines) "was intended to be a substitute for, or to immunize Otter Tail from, antitrust regulation for refusing to deal with municipal corporations." (*Ibid.*) This authority is distinguishable because these plaintiffs are attempting to claim injury by invoking the same subject matter covered by the government regulatory authority, but recharacterizing it as antitrust injury, all the while seeking to recover damages for overcharged payments and allegedly excessive rates. This is a distinction without a difference.

Plaintiffs next argue that the authority of *MCI Telecommunications Corp. v. American Telephone & Telegraph Co.* (1994) 512 U.S. 218 [129 L.Ed.2d 182, 114 S.Ct. 2223] and *Maislin Industries, U. S. v. Primary Steel* (1990) 497 U.S. 116 [111 L.Ed.2d 94, 110 S.Ct. 2759] should indicate that the kind of market-based tariffs that are in use here are not properly regulated solely by the FPA and FERC. In *Lockyer, supra*, 383 F.3d 1006, 1013, the court of appeals summarized and distinguished those same holdings in a closely analogous factual context (regulatory challenges by the state to the actions of

the federal agency). The court explained the nature of these different market-based regulatory schemes as follows: "In *MCI,* the Supreme Court held that the FCC could not eliminate rate-filing requirements for any class of carrier, even when necessary to promote competitive markets. In *Maislin,* the Court held that the ICC could not allow common carriers to charge unfiled, privately negotiated rates lower than the filed rates, even when the carriers were in highly competitive markets. [Citation.] As the Court stated in *Maislin,* the existence of a competitive market 'cannot provide the ICC authority to alter well-established statutory filed rate requirements.' [Citation.]" (*Lockyer, supra,* 383 F.3d at p. 1013.) The court of appeals then distinguished the FERC regulatory scheme from those schemes, in the course of rejecting an argument that the FERC procedures were fatally defective: "The agencies in *MCI* and *Maislin* relied on market forces alone in approving market-based tariffs. In contrast, FERC's system consists of a finding that the applicant lacks market power (or has taken sufficient steps to mitigate market power), coupled with strict reporting requirements to ensure that the rate is 'just and reasonable' and that markets are not subject to manipulation. Here, FERC required the wholesale seller to file a market analysis every four months, and quarterly reports summarizing its transactions during the preceding three months. These transaction summaries include both long and short-term contracts, purportedly with reports of some sales for intervals as small as ten minutes. FERC has affirmed in its presentation before us that it is not contending that approval of a market-based tariff based on market forces alone would comply with the FPA or the filed rate doctrine. *Rather, the crucial difference between MCI/Maislin and the present circumstances is the dual requirement of an ex ante finding of the absence of market power and sufficient post-approval reporting requirements. Given this, FERC argues that its market-based tariff does not run afoul of MCI or Maislin, and we agree."* (*Ibid.,* italics added.)

Plaintiffs have provided no reason to depart from the above analysis, and disregard the fact that the FPA includes certain safeguards to oversee the reasonableness of rates for the wholesale electricity market. It does not make any difference that in *Lockyer, supra,* 383 F.3d 1006, 1013, the court of appeals reached those conclusions but nevertheless went on to criticize the regulatory efforts of FERC as "abdicating its regulatory responsibility." (*Id.* at pp. 1014–1015.) At that time, the court of appeals accepted the argument that "even if market-based tariffs are lawful in concept, FERC failed to administer the tariffs in accordance with their terms and abused its discretion in limiting available remedies for regulatory violations." (*Id.* at p. 1014.) Specifically, in *Lockyer,* the court found fault with FERC's past policies as follows. First, it had implemented market-based tariffs so as to virtually deregulate the wholesale electricity industry and remove it from statutorily required over-sight, but without providing appropriate safeguards, such as "enforceable

post-approval reporting that would enable FERC to determine whether the rates were 'just and reasonable' and whether market forces were truly determining the price." (*Ibid.*) Second, these crucial transactional reporting requirements were not followed during the subject time period: "Indeed, non-compliance with FERC's reporting requirements was rampant throughout California's energy crisis. FERC itself has acknowledged that during the height of the energy crisis the quarterly reports of several major wholesalers failed to include the transaction-specific data through which the agency at least theoretically could have monitored the California energy market . . . . [¶] . . . [¶] Thus, the very mechanism that distinguished FERC's tariff from those prohibited by the Supreme Court in *MCI* and *Maislin* was, for all practical purposes, non-existent while energy prices skyrocketed and rolling brown-outs threatened California's businesses and citizens." (*Ibid.*)

Notwithstanding those past institutional failures on the part of FERC, the court of appeals in *Lockyer, supra*, 383 F.3d 1006, acknowledged that FERC possessed "broad remedial authority to address anti-competitive behavior" (*id.* at p. 1015), such as ordering refunds in instances where utilities violated FPA provisions (exceeding approved rates or charging unapproved rates; FPA, § 205, 16 U.S.C. § 824d).[8] FERC can also order profits to be disgorged when a regulated utility fails to comply with requirements for posting rates and nondiscrimination requirements. Such remedial power (e.g., the power to order retroactive refunds) "is inherent in FERC's authority to approve a market-based tariff in the first instance." (*Lockyer, supra*, 383 F.3d at pp. 1015–1016.) This result was required in order to avoid having only an illusory remedy available from FERC under a market-based tariff system. The court of appeals therefore returned the matter to FERC "to reconsider its remedial options in the first instance." (*Id.* at p. 1018.)

█ Plaintiffs interpret all these authorities as showing that state antitrust regulation should be allowed in this instance, to fill the gaps left when FERC scaled back its activities and abdicated its regulatory responsibilities. We cannot agree, because even considering its difficult history, FERC has been provided with sufficient regulatory authority such that federal preemption principles must be applied to these antitrust/UCL challenges arising from wholesale electricity market activities. Plaintiffs acknowledge that FERC refunds are a potential remedy and offset for their claims. Moreover, they have been unable to show how any damages from defendants' conduct, recoverable under an antitrust theory, would be separate in nature from the allegedly overpaid rates that they paid for power, which would also give rise to any refund requests. The authority of *Hendricks, supra*, 160 F.Supp.2d, 1155, 1163 (decided in 2001), regarding permissible concurrent theories of

---

[8] The FPA, § 205, cited in *Lockyer, supra*, 383 F.3d 1006, 1015–1016, is now codified at 16 United States Code section 824d. (U.S.C.A. Tables, vol. I, p. 251.)

relief, lacks persuasiveness in light of more recent case law such as *Snohomish, supra,* 384 F.3d 756 and *Grays Harbor, supra,* 379 F.3d 641 (decided in 2004).[9] Similarly, although plaintiffs rely on *Younger, supra,* 26 Cal.3d 397 to contend concurrent state antitrust regulation in the wholesale market is appropriate, that case has not been extended beyond its facts pertaining to permissible investigations regarding matters within antitrust state jurisdiction, and this is not the right case to do so. (*Id.* at pp. 406–409.)

Plaintiffs' attempts to rely on fundamental case law from the 1970's and 1980's are unsuccessful because they cannot bring themselves within those general exceptions to well-established preemption principles. Rather, the logic of the recent Ninth Circuit authority in this area is persuasive and should be followed here. (*Snohomish, supra,* 384 F.3d 756.) The trial court properly sustained the demurrers on preemption grounds.

## III

## EFFECT OF FILED RATE DOCTRINE

The trial court's ruling stated that in light of its finding that federal preemption bars plaintiffs' claims, it was not required to reach the issue of the applicability of the filed rate doctrine. However, it concluded those principles would nevertheless bar these claims (relying on, e.g., *Snohomish, supra,* 384 F.3d 756; *Grays Harbor, supra,* 379 F.3d 641; *Dynegy, supra,* 375 F.3d 831, 851–853). All these issues have been fully briefed on appeal. Although the preemption ground alone would provide a sufficient basis to uphold the ruling on demurrer, in an abundance of caution, we will also address the closely related filed rate doctrine issues. Commentators have referred to this line of case law as applying and/or conflating the filed rate doctrine together with field and conflict preemption. (Cal. Antitrust and Unfair Competition Law (Cont.Ed.Bar 3d ed. 2005 supp.) § 7.06, p. 41.)

 " 'At its most basic, the filed rate doctrine provides that state law, and some federal law (e.g. antitrust law), may not be used to invalidate a filed rate nor to assume a rate would be charged other than the rate adopted by the federal agency in question.' [Citations.] '[T]he filed rate doctrine has prohibited not just a state court (or a federal court applying state law) from setting a rate different from that chosen by FERC, but also from assuming a hypothetical rate different from that actually set by FERC.' " (*Grays Harbor, supra,* 379 F.3d 641, 650–651.)

---

[9] See also *T & E Pastorino v. Duke Energy Trading* (9th Cir. 2005) 123 Fed.Appx. 813, holding UCL allegations regarding transactions in the wholesale energy market fell within the exclusive jurisdiction of FPA, where tariffs approved by FERC would provide the context for determination of any violations of the UCL.

Also in *Grays Harbor*, the court addressed contemporary concerns that application of "the filed rate doctrine to market-based rates that have not been filed with FERC would be an unwise and unprecedented expansion of the doctrine." (*Grays Harbor, supra*, 379 F.3d 641, 651.) The court found no such barrier to the use of this doctrine, for the following reasons: "[T]he market-based rate regime established by FERC continues FERC's oversight of the rates charged. FERC only permits power sales at market-based rates after scrutinizing whether 'the seller and its affiliates do not have, or have adequately mitigated, market power in generation and transmission and cannot erect other barriers to entry.' [Citation.] According to FERC, these conditions assure that the market-based rates charged comply with the FPA's requirement that rates be just and reasonable. [Citations.] This oversight is ongoing . . . . [¶] . . . Further, FERC contends that such procedures effectively constitute review of rates prior to their implementation. [Citation.]" (*Ibid.*) FERC also has a remedies provision regarding refunds in 16 United States Code section 824e(a) and (b).

Based on those factors, the court of appeals stated that "while market-based rates may not have historically been the type of rate envisioned by the filed rate doctrine, we conclude that they do not fall outside of the purview of the doctrine." (*Grays Harbor, supra*, 379 F.3d 641, 651.) Although this analysis of the evolution of this regulatory method is very general in nature, it is nevertheless persuasive and we have been given no reason to depart from it here. Instead, the allegations of the master complaint amount to requests for penalties for alleged anticompetitive conduct by defendants, and these potentially would interfere with FERC supervision of market-based rates and any enforcement activities allowed under FERC procedures. We are reluctant to engage in policy analysis to the extent that plaintiffs request in this fast-changing and highly regulated area.

Moreover, in light of these conclusions, we need not address in detail plaintiffs' limitations argument, that FERC was without jurisdiction as to conduct occurring prior to October 2, 2000, due to its own rulings about its assertion of jurisdiction as depending on the timing of events giving rise to claims filed. We find the filed rate doctrine to be instructive in this context and conclude that it reinforces our conclusions regarding preemption. (*Dynegy, supra*, 375 F.3d at pp. 852–853; *Entergy La., Inc. v. Louisiana Pub. Serv. Comm'n* (2003) 539 U.S. 39, 47 [156 L.Ed.2d 34, 123 S.Ct. 2050] [filed rate doctrine may apply to state regulators through federal preemption under the supremacy clause].) The trial court correctly sustained the demurrer without leave to amend on this ground as well.

## DISPOSITION

The judgment of dismissal is affirmed. Plaintiffs are to pay the ordinary costs on appeal.

McConnell, P. J., and Irion, J., concurred.